ARKANSAS BOARD of EXAMINERS In Counseling *v.*
Mary Pat CARLSON

98-102                                                976 S.W.2d 934

Supreme Court of Arkansas
Opinion delivered October 29, 1998

[Petition for rehearing denied December 3, 1998.]

*Winston Bryant*, Att'y Gen., by: *Arnold M. Jochums*, Ass't Att'y Gen., for appellant.

*Wright & Burke*, by: *William Randal Wright*, for appellee.

DONALD L. CORBIN, Justice. Appellant Arkansas Board of Examiners in Counseling appeals the judgment of the Miller County Circuit Court reversing the Board's decision to revoke Appellee Mary Pat Carlson's license to practice as a licensed professional counselor. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) & (6), as it presents an issue of first impression requiring our interpretation of an act of the General Assembly. On appeal, the Board argues that (1) there is substantial evidence to support its decision, and (2) the circuit court erred in reversing its decision on a ground not raised before the Board. We reverse the ruling of the circuit court and reinstate the Board's decision.

## Facts and Procedural History

In May 1996, the Board sent Carlson notice of a hearing to determine whether she had violated the Counselors Licensing Law, Ark. Code Ann. § 17-27-101 to -308 (Repl. 1995), the Board's rules, and the ethical standards for licensees. The Board alleged that Carlson had violated section 17-27-102(5), which prohibits licensees from conducting projective tests, and had committed several ethical violations stemming from Carlson's counsel-

ing of RMN, a minor female born on July 9, 1988. As to the ethical violations, the Board alleged that Carlson had failed to notify RMN's psychologist, Dr. Betty Feir, that she had been seeing the child during the same time that Dr. Feir was treating her. The Board alleged further that Carlson had exceeded the boundaries of her practice, as reflected in her Statement of Intent[1], by administering four tests to RMN: (1) the Bender Visual Motor Gestalt test (Bender-Gestalt), (2) the Wechsler Intelligence Scales for Children, Revised (WISC-R), (3) the Draw-A-Person test (DAP), and (4) the Draw-A-Family test (DAF). The Board asserted that these tests are projective instruments that counselors are not authorized to administer. *See* section 17-27-102(5). The Board also asserted that Carlson was not licensed in the appraisal speciality. The Board's notice reflected that it had adopted the Ethical Standards of the American Association for Counseling and Development (March 1988) (Ethical Standards) and the Code of Ethics and Standards of Practice of the American Counseling Association (July 1995) (Code of Ethics).

A hearing was held before the Board on June 7, 1996, during which testimony and exhibits were presented on the matter. In an order dated June 24, 1996, the Board revoked Carlson's license to practice. Particularly, the Board found that Carlson had violated Ethical Standard B(3), pertaining to her failure to notify RMN's psychologist that she was simultaneously seeing the child. The Board also found that Carlson had used appraisal techniques despite the fact that she had not been approved for a specialty license in the appraisal area, in violation of section 17-27-301(6) and Board Rules 3.3 and 4.2. The Board also found that Carlson's use of appraisal instruments constituted practice outside her Statement of Intent. Lastly, the Board found that Carlson's use of projective instruments in violation of section 17-27-102(5)(B) constituted unprofessional conduct.

Carlson appealed to the circuit court, arguing, among other things, that the Board's decision was not supported by evidence, was arbitrary and capricious, and was based on rules and regula-

---

[1] For purposes of clarification, we note that during the proceedings below, the term "Letter of Intent" was used interchangeably with that of "Statement of Intent."

tions not properly adopted by the Board. The circuit court vacated the Board's conclusions of law and ordered the Board to reconsider its ruling. This appeal followed.

*Standard of Review*

■ ■ Judicial review of decisions of the Arkansas Board of Examiners in Counseling is governed by the Arkansas Administrative Procedure Act (APA) pursuant to Ark. Code Ann § 25-15-212 (Repl. 1996). *See Bohannon v. Arkansas State Bd. of Nursing,* 320 Ark. 169, 895 S.W.2d 923 (1995). Our review, like that of the circuit court, is limited in scope and is directed not to the decision of the circuit court, but to the decision of the administrative agency. *Arkansas Dep't of Human Servs. v. Thompson,* 331 Ark. 181, 959 S.W.2d 46 (1998). Under the APA, it is not the role of the circuit courts or the appellate courts to conduct a *de novo* review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision or whether the agency's decision runs afoul of one of the other criteria set out in section 25-15-212(h). *Id.* We review the entire record in making this determination. *Arkansas Alcoholic Beverage Control Bd. v. Muncrief,* 308 Ark. 373, 825 S.W.2d 816 (1992).

■ We will not reverse the Board's decision if there is any substantial evidence to support it. *Bohannon,* 320 Ark. 169, 895 S.W.2d 923. Substantial evidence is evidence that is valid, legal, and persuasive and that a reasonable mind might accept to support a conclusion and force the mind to pass beyond speculation and conjecture. *Id.* The question is not whether the testimony would have supported a contrary finding, but whether it would support the finding that was made. *Id.* It is the prerogative of the board to believe or disbelieve any witness and to decide what weight to accord the evidence. *Id.* Similarly, the construction of a state statute by an administrative board or agency will not be overturned unless it is clearly wrong. *Thomas v. Arkansas Dep't of Human Servs.,* 319 Ark. 782, 894 S.W.2d 584 (1995). This court has often stated that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze

underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency. *See, e.g., Hamilton v. A.P.C. & E. Comm'n*, 333 Ark. 370, 969 S.W.2d 653 (1998); *Social Work Licensing Bd. v. Moncebaiz*, 332 Ark. 67, 962 S.W.2d 797 (1998); *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992).

## *I.   Substantial Evidence*

The Board asserts that its decision to revoke Carlson's license is supported by substantial evidence. Specifically, the Board contends that there was substantial evidence to support its conclusion that (1) Carlson violated Ethical Standard B(3) by failing to notify RMN's psychologist that she was seeing the child as a patient, and (2) Carlson exceeded the scope of her practice, as originally licensed by the Board and evident in her Statement of Intent, in violation of the statutory law and Rules 2.8 and 3.3 of the Arkansas Board of Examiners in Counseling Rules and Regulations (Board Rules).

## *A.   Failure to Notify Child's Psychologist*

The Board found that Carlson had violated Ethical Standard B(3) by failing to notify RMN's psychologist that she was counseling the child during the same period of time. Carlson maintains that RMN was never her client; instead, she asserts that RMN's mother was her patient.

Ethical Standard B(3) provides:

> If an individual is already in a counseling relationship with another professional person, the member does not enter into a counseling relationship without first contacting and receiving the approval of that other professional. If the member discovers that the client is in another counseling relationship after the counseling relationship begins, the member must gain the consent of the other professional or terminate the relationship, unless the client elects to terminate the other relationship.

Dr. Betty Feir, a psychologist licensed in Arkansas and Texas, testified that she started seeing RMN as a patient when the child was three years old. She stated that RMN had been progressing beautifully up until the fall before the Board's hearing, when the child began having some difficulty. Specifically, she stated that the child had problems with bed-wetting and that she had become somewhat withdrawn. She stated that when she asked the child what was wrong, RMN revealed that she had been going to Carlson's offices and that Carlson had been talking to her about her situation and asking her questions. She stated that RMN indicated that she was not supposed to tell this to Dr. Feir. She also stated that RMN indicated that she did not want to go to Carlson's office. Dr. Feir perceived that RMN was having the kind of relationship with Carlson similar to the one RMN had with her, and that it was certainly RMN's perception that Carlson was her therapist. She stated that if, in fact, RMN's mother was actually Carlson's client, it was unusual and inappropriate for a child of RMN's age to be in the room while her mother was having therapy. She stated that it would not be standard therapy to see an adult in therapy with a child present. She stated that Carlson knew that she (Dr. Feir) was seeing RMN because Carlson had heard her testify about her relationship with RMN in court. She stated that Carlson also knew that RMN was continuing to see her.

Dr. Wrenda Gallien, a board-certified psychiatrist in child psychiatry, testified that she had a doctor-patient relationship with RMN that began in November of 1995. She stated that from her interviews of RMN, it appeared that the child had seen two mental health professionals at the same time. She stated that RMN said she did not like going to two therapists. She stated that on the child's second visit to her, RMN volunteered that she had been asked not to talk about her visits with Carlson. She stated that RMN indicated that Carlson had called her father stupid, and that her mother and Carlson both indicated that if RMN said that she wanted to continue living with her father, she would not be able to see her mother anymore. Dr. Gallien stated that it is normal for a parent to be present when a child is being counseled, but

that if the therapy is for a parent, it is not normal for the child to be present during therapy.

Carlson testified that the only substantive contact she had with RMN was when she conducted an evaluation of the child for purposes of giving testimony at trial. She denied that RMN was ever her client or patient. She stated that RMN's mother's attorney had requested that she evaluate RMN for an upcoming hearing in Texas, involving the child's continued visitation with her mother. She stated that she did so testify in court on June 30, 1994. She admitted that RMN had mentioned Dr. Feir to her, and that she knew Dr. Feir would give expert testimony at the Texas hearing in June 1994. She indicated that after she heard Dr. Feir's testimony, she became aware that Dr. Feir had been treating RMN for a number of years. She denied having counseling sessions with RMN after June 30, 1994.

On cross–examination, however, Carlson admitted to having written a letter to RMN's father on October 13, 1995, that reflected "following your request to discuss with [RMN's mother] whether she would be willing to have you sit in on *counseling sessions with [RMN]*, I obtained her agreement and attempted to get in touch with you to notify you." (Emphasis added.) Moreover, on rebuttal, Patricia Bradley, an employee of RMN's father, testified that on November 7, 1995, she saw RMN and her mother go into Carlson's office, and that when they came out, RMN was carrying some books and papers. Bradley stated that she heard RMN crying and telling her mother that she did not like the things that they, presumably RMN's mother and Carlson, were saying about her daddy. Bradley stated that on November 14, 1995, she saw RMN go back into Carlson's office carrying paper and books, and that she was not carrying anything when she left.

From the foregoing testimony, we conclude that there is substantial evidence to support the Board's finding that Carlson had seen RMN as a counseling client, but had made no attempt, under Ethical Standard B(3), to consult with Dr. Feir or to coordinate her activities with Dr. Feir despite her knowledge that RMN was seeing Dr. Feir.

## B. Exceeding the Scope of Her Duties as Licensed

The Board argues that there is substantial evidence to support its decision that Carlson exceeded the scope of her licensed practice by administering the WISC-R, the Bender-Gestalt, the DAP, and the DAF tests to RMN, in violation of sections 17-27-102 and 17-27-301 and Board Rules 2.8 and 3.3.

Section 17-27-301 sets out the qualifications for applicants who wish to be licensed professional counselors. Subsection (6) provides:

> *The applicant will declare special competencies and demonstrate pro-fessional competence in specialty areas by passing a written or oral or situational examination, or any combination thereof, as the board will prescribe.* Upon examination of credentials the board, by a major-ity of the board members present and voting, may consider such credentials adequate evidence of professional competence and recommend to the chairman of the board that a license be approved in that specialty. [Emphasis added.]

Board Rule 2.8 provides that the applicant's Statement of Intent refers to a typed statement from the license applicant "describing the intended use of the license, the public with whom the applicant will work, and the counseling approaches the appli-cant plans to use *(including techniques and tools)*." (Emphasis added.) Carlson's Statement of Intent, approved by the Board on Septem-ber 21, 1985, reflects:

> It is my intent to work in a community mental health clinic with chronic and acute mental health clients in group, individual, family and couple counseling using eclectic techniques of mar-riage and family counseling, individual counseling and group counseling.
>
> My areas of expertise include: marriage and family counsel-ing (American Association of Marriage and Family Therapy, clinical member), hypno-counseling (American Society of Clinical Hypnosis), sex counseling (American Association of Sex Educators, Counselors, Therapists — certified member), individ-ual and group counseling (Licensed Professional Counselor, Texas).

Dr. Ann Thomas, Executive Director of the Licensing Board, testified that Carlson's original Statement of Intent is the current statement on file with the Board, and that it does not contain a specialty in appraisal.

Rule 3.3 of the Board's Rules and Regulations provides:

> Areas of specialization, as specified in the statement of professional intent, shall be evaluated by the Board. The Board will use the national standards for the preparation of counselors, prepared by the specific professional association, as a guide in establishing the standards, for counseling, i.e., Marriage and Family Counseling, Rehabilitation Counseling, Pastoral Counseling, Career Counseling, School Counseling, Clinical Mental Health Counseling/Psychotherapy, Geriatric Counseling, Counseling Supervision, Appraisal or other specified counseling areas.

Dr. Philip Hestand, a psychologist licensed by both this Board and the Board of Examiners in Psychology, testified about the particular tests given by Carlson to RMN and about the training and specialization required to administer such tests. He stated that he had previously served on this Board and was familiar with the Board Rules and the Code of Ethics that applies to counselors. He stated that the WISC-R is a test of intelligence and ability and is considered an appraisal instrument, as some of the subtests require some judgment or interpretation by the administrator of the test as to quality of the response. He stated that an individual licensed by the Board who has a specialization in appraisal and has had course work in administering this type of test would be eligible to give the WISC-R.

Dr. Hestand stated that the Bender-Gestalt test was developed to assess both developmental age and the possibility of neurological impairment. He stated that a person who has had course work in testing of this type, including some sort of neurological assessment training, and has met the requirements for the appraisal specialization would be allowed to administer the test and make the conclusion that there is no indication of neurological problem. He stated that although the Bender-Gestalt test had been used by some as a projective test, it appeared from Carlson's report on RMN that she did not use it as a projective test.

Dr. Hestand testified that the DAP test is a projective test when you use it to interpret internal processes that might be going on such as personal characteristics or attitudes or you are trying to make some kind of determination about emotionality based on a drawing. He stated that as a projective instrument, the DAP test is also an assessment of emotionality or personality and thus, it is an appraisal instrument. He stated that from Carlson's report, it was apparent that the DAP test had been utilized as a projective instrument, as she had made interpretations about RMN having a sense of ambivalence, seeing men as powerful and also extremely weak or ineffectual, and that there were indications from the drawing of tension and anxiety, but overall a sense of a reasonably secure individual. He stated that the DAF test, similar to the DAP test, was also used by Carlson as a projective instrument, as she made subjective interpretations about RMN's attitudes based on the projection of the child into the drawing.

Dr. Hestand testified that a licensee's practice is based on his or her statement of intent. He explained that at the time of licensing, the applicant submits a letter of intent to the Board, wherein the applicant states what he or she intends to do in his or her practice. The Board then determines, based on what the applicant said, his or her credentials, and an oral exam, whether or not the applicant is competent to do those things. He stated that not all applicants have the same course work background or credentialing, and that the Board determines at the time of licensing what the applicant is competent to do or not competent to do. He stated further that not all persons licensed by the Board are licensed to do the same things. He stated that a counselor is required to have the appraisal specialization in order to use assessment instruments that are standardized or that require course work in training to administer. He stated that Carlson was approved for specialization in marriage and family counseling, and that she thus was not authorized to do psychological assessments using the foregoing tests. He noted that under the Board Rules, a person must have an assessment specialization before they can administer the WISC-R, the DAP, and the DAF as an assessment instrument, and that this requirement exists even if the test is not used as a projective instrument. He stated further that to administer the Bender-

Gestalt and then write a report on the results requires an appraisal specialization, as the counselor is required to demonstrate that he or she has competency in appraising individuals both developmentally and psychologically. He stated that even a person holding an appraisal specialization might not be allowed to do particular types of testing, and that under the Arkansas counseling law, licensed counselors are never approved to administer projective tests. He stated that the conclusion of Carlson's report appears to be based on projective testing rather than objective testing.

During her testimony before the Board, Carlson admitted that persons licensed by the Board must confine their practice within the ambit of their Statements of Intent. She also admitted that she does not have a speciality license. She stated that she had previously submitted an application to the Board for the appraisal specialty license, and that the Board had informed her that she would need to take three additional three-hour college courses in order to obtain such specialty license. She denied, however, that she needed such a specialty license to perform appraisals. When questioned by one of the Board members, Carlson contradicted herself, stating that she thought it would be good to have the appraisal specialty on her credentials, but that she did not think that she could do more with the appraisal specialty than she could without it. Carlson further admitted that the DAF and DAP tests can be used in a projective manner, but she denied having used them in such a way.

We conclude that there was substantial evidence to support the Board's findings that Carlson was not licensed in the appraisal speciality, and that she was therefore not authorized to perform the four appraisal tests that she administered to RMN. There is likewise substantial evidence that at least two of the tests, the DAP and the DAF tests, were used by Carlson as projective instruments, which is prohibited by section 17-27-102(5)(B).

We note Carlson's arguments that (1) section 17-27-301(6) cannot be applied to her because she had been licensed by the Board prior to the time that subsection was passed by the General Assembly, and (2) that the Board applied the wrong version of Rule 3.3 to her case. Both these arguments must necessarily fail

because Carlson did not raise them before the Board, despite the fact that she raised them in the circuit court. This court will not set aside administrative decisions on grounds that were not presented to the agency. "[I]t is essential to judicial review under the Arkansas Administrative Procedure Act that issues must be raised before the administrative agency appealed from or they will not be addressed by this court[.]" *Wright*, 311 Ark. at 132, 842 S.W.2d at 46 (citing *Alcoholic Beverage Control Div. v. Barnett*, 285 Ark. 189, 685 S.W.2d 511 (1985)).

## II. Adoption of the Board's Rules

The Board argues that the circuit court erred in reversing its decision on grounds not previously raised before the Board. Particularly, the Board asserts that Carlson failed to raise the issue of the Board's alleged improper adoption of its Rules governing specialization and the 1988 Ethical Standards during the administrative hearing. The Board additionally asserts that the circuit court erred in concluding that Carlson was not provided sufficient notice of the law so that she could conform her conduct to the statute because neither the licensing law nor the Board's regulations defined "projective instruments." Again, the Board asserts that this issue was raised for the first time in circuit court. We agree that the circuit court's reversal of the Board's decision on those grounds was erroneous.

The circuit court ruled that the Board's rules and the Ethical Standards were not properly adopted under Ark. Code Ann. § 25-15-204 (Repl. 1996). The circuit court concluded that the lack of notice deprived Carlson of her rights to due process of the law under both the Arkansas and United States Constitutions. The circuit court's order reflects in part:

> Because the rules and regulations were not properly filed with the Secretary of State, there is no legal notice of what is expected of counselors subject to said rules and regulations. *There was no evidence presented by the Board of other notice and, in fact, Ms. Carlson's attorney objected to the lack of notice.* [Emphasis added.]

It is unclear what the circuit judge was referring to when he found that Appellee's attorney had objected to the lack of notice

of the Board's rules. We are not aware of any such objection made by Carlson to the Board. To the contrary, during opening statement before the Board, Carlson's attorney stated that "we admit that the board has adopted the standards." Moreover, Carlson admitted in her response to the Board's notice that the Board had adopted ethical standards, and that she is subject to the ethical provisions contained within the Ethical Standards and the Code of Ethics, enumerated by the Board in its notice.

■ ■ We will not set aside an administrative determination upon a ground not presented to the agency because to do so would deprive the agency of the opportunity to consider the matter, make its ruling, and state the reasons for its action. *Franklin v. Arkansas Dep't of Human Servs.*, 319 Ark. 468, 892 S.W.2d 262 (1995) (citing *Riverways Home Care v. Arkansas Health Servs. Comm'n*, 309 Ark. 452, 831 S.W.2d 611 (1992); *Arkansas Cemetery Bd. v. Memorial Properties, Inc.*, 272 Ark. 172, 616 S.W.2d 713 (1981)). The same may be said for constitutional arguments not raised at the agency level. *See Arkansas Health Servs. Agency v. Desiderata, Inc.*, 331 Ark. 144, 958 S.W.2d 7 (1998) (approving the rule adopted by the court of appeals in *Hamilton v. Jeffrey Stone Co.*, 6 Ark. App. 333, 641 S.W.2d 723 (1982) that even though the Workers' Compensation Commission may not have authority to declare statutes unconstitutional, such constitutional issues should first be raised at the Administrative Law Judge or Commission level, because such issues often require an exhaustive analysis that is best accomplished by an adversary proceeding, which can only be done at the hearing level). Carlson's failure to raise the due-process arguments before the Board preclude their consideration by this court on appeal. *Franklin*, 319 Ark. 468, 892 S.W.2d 262. Thus, it was error for the circuit court to reverse the Board's decision on the ground that the administrative rules had not been properly adopted. We accordingly reverse the ruling of the circuit court, and we reinstate the Board's decision in its entirety.

THORNTON, J., not participating.