ARKANSAS STATE PLANT BOARD *v.* Billy Paul
BULLOCK, *d/b/a* Bullock Flying Service

01-216 48 S.W.3d 516

Supreme Court of Arkansas
Opinion delivered June 28, 2001

*Mark Pryor*, Att'y Gen., by: *Arnold M. Jochums*, Ass't Att'y Gen., for appellant.

*Russell D. Berry*, for appellee.

TOM GLAZE, Justice. The Arkansas State Plant Board brings this appeal from the Arkansas County Circuit Court's decision reversing the Board's determination that Billy Paul Bullock, d/b/a Bullock Flying Service (BFS), a crop-dusting service, unlawfully used a pesticide in violation of Ark. Code Ann. § 20-20-214(a)(2) (Repl. 2000). We take jurisdiction of the appeal under Ark. Sup. Ct. R. 1-2(b)(6) because it involves a substantial question of law concerning the interpretation of a statute, Ark. Code. Ann. § 2-16-203(b) (Supp. 1999), and the Board's penalty matrix regulation authorized under that statute.

Steve and Rhonda Harris initiated this action by filing a complaint against BFS with the Plant Board, alleging that on May 4, 1996, BFS allowed an aerially-applied chemical, Stam 4E, to drift onto their garden, causing damage to many of their plants. After the Plant Board investigated the Harrises' complaint and held a hearing on the matter, the Board's Pesticide Committee, and later the

Board itself, concluded BFS had violated Ark. Code Ann. § 20-20-214(a)(2)[1] by using a pesticide in a manner inconsistent with the labeling registered with the United States Environmental Protection Agency (EPA) or the Plant Board or in violation of EPA or Plant Board restrictions on the use of that pesticide. The Board imposed a $400.00 fine against BFS for the violation, and BFS appealed that decision to the Arkansas County Circuit Court as authorized under the Administrative Procedures Act, Ark. Code Ann. §§ 25-15-201 *et seq.* (Repl. 1996 and Supp. 1999). The circuit court reversed the Board's decision, finding the evidence was insufficient to support the Board's ruling and fine.

We first must consider § 20-20-214(a)(2) and the registered label that BFS is alleged to have violated or misused. As previously mentioned, § 20-20-214(a)(2) prohibits a licensed applicator of pesticides from using a pesticide in a manner inconsistent with the registered label or other Board restrictions. The chemical involved here is propanil, or Stam 4E, which is a selective postemergence herbicide for use only in the control of certain weeds that grow in rice crops. The warning label's "use restrictions" for Stam 4E read as follows:

> Do not apply to any crop other than rice. STAM 4E herbicide injures most crops except cereal grains and perennial grasses. *Avoid drift or accidental application* from turning aircraft on cotton, soybeans, corn, safflower, seedling legumes, vegetables, orchards, vineyards, gardens, shrubs, and ornamentals. Once applied, it does not release fumes hazardous to nearby crops. (Emphasis added.)

The label also provides that applicators are to "[a]void applications when the wind speed exceeds 10 mph because of drift hazard to sensitive crops and the possibility of uneven (streaked) application."

▮ The Plant Board found that BFS's application of Stam 4E to Benny Thigpen's rice crop resulted in an off-target drift onto nearby property occupied by the Harrises, and such application constituted using the product in a manner inconsistent with the

---

[1] (a) The State Plant Board may . . . after opportunity for a hearing . . . deny, suspend, revoke, or modify any license or permit, or any provision thereof, issued under this subchapter if it finds that the applicant or the holder of a license or permit has committed any of the following acts, each of which is declared to be a violation of this subchapter . . . :

(2) . . . used a pesticide in a manner inconsistent with the labeling registered with EPA or the Plant Board for that pesticide, or in violation of EPA or State Plant Board restrictions on the use of that pesticide[.]

above label use restrictions. In this appeal, we directly review the Board's decision, not the circuit court's, and in doing so, we must decide whether the Board's decision is supported by substantial evidence, given its strongest probative force in favor of the agency's ruling. *Culpepper v. Board of Chiropractic Examiners*, 343 Ark. 467, 36 S.W.3d 335 (2001). The question is not whether the testimony or evidence would have supported a contrary finding, but instead whether it supports the finding made. *Arkansas Bd. of Examiners v. Carlson*, 334 Ark. 614, 976 S.W.2d 934 (1998).

Other standards that this court follows when reviewing administrative decisions direct us to review the entire record to determine whether there is any substantial evidence to support the administrative agency's decision, whether there is arbitrary and capricious action, or whether the action is characterized by abuse of discretion. *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992). The stated correlative rule is that, to establish an absence of substantial evidence, the party appealing the board's or agency's decision must demonstrate that the proof before the administrative board was so nearly undisputed that fair-minded persons could not reach its conclusions. *Id.* at 130. We also follow the settled rule that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency. *Id.* As such, the administrative agency or board is afforded great deference. *Culpepper*, 343 Ark. at 472.

In reviewing the record and giving deference to the Board's ruling, as we must, we easily conclude that there is substantial evidence that supports the decision that BFS failed to comply with Stam 4E's use restrictions on May 4, 1996, causing damage to the Harrises' garden and trees. At the Board's hearing, Rhonda Harris testified that she was awakened that morning by the sound of an airplane. She got up and looked out of her window, and noticed that her horse was running. When she stepped outside to try to calm the horse, she noticed a mist that burned her eyes. She recognized the smell in the air as that of Stam, so she immediately got a water hose and started spraying down her garden. She remained in the garden for approximately forty-five minutes, but when she became concerned about having the spray on her, she went inside to wash herself.

At some point after May 4, trees and plants in the Harrises' garden began to show signs of burning. Plant Board Investigator Kevin Cauley went to the Harrises' property on June 4, 1996, to look at their garden; he noted that the garden and trees had propanil burn that appeared to be about four weeks old. At the hearing before the Plant Board, Cauley appeared as the Board's expert witness and introduced photographs he had taken of the burned plants. Cauley's narrative report of the incident reflected that Steve Harris claimed the reason he waited in filing the request for an investigation was because Harris had talked to Thigpen after the application, and Thigpen said that he would pay Harris for his losses; however, after that, Harris did not hear from Thigpen for several weeks. Thigpen's statement to the Plant Board was that Thigpen told Harris he would pay him for the damage to the Harrises' garden as soon as Thigpen got his wheat cut and his soybeans planted. Thigpen also made a statement, contained in Cauley's report, that he instructed BFS to put the spray on his fields on the morning in question regardless of the weather.

The Plant Board's further investigation revealed that the records of DeWitt Fertilizer Company showed that Thigpen Grain & Cattle purchased a quantity of Stam on May 2, 1996, and the records of BFS showed that BFS had applied Stam on May 4, 1996, to Thigpen's field. BFS's records also showed that the wind speed on the morning of May 4, 1996, was three miles per hour and within label restrictions. However, based on his experience as a Plant Board investigator, Cauley concluded that BFS's application of Stam to Thigpen's field resulted in drift onto the Harrises' property.

The Board also heard testimony from Patty Moore, whose house was located between Thigpen's field and the Harrises' property. Moore stated that the day before this incident, Thigpen had gone to visit her, and he informed her that if the wind was not blowing the following morning, he was going to spray his field. Thigpen offered to water Moore's garden down if she did not want to get up that early. On the morning of May 4, around 6:30, Moore went outside after she heard the crop-duster and began to water down her garden; however, she did not feel any mist, and did not recall the wind blowing particularly hard.

The Board obviously believed Rhonda Harris's testimony that she observed a crop-duster spraying Stam 4E on the morning of May 4, 1996, and that the chemical being sprayed had drifted onto her property and her face and skin. BFS's assertion that it sprayed

the chemical when the wind speed was less than ten miles per hour is not dispositive of whether its application was consistent with the label, since Rhonda Harris gave direct testimony that she saw and felt the drift of Stam 4E on the day BFS sprayed it on Thigpen's property. Furthermore, as already mentioned, the Board's expert, Mr.Cauley, confirmed that BFS sprayed Stam 4E on Thigpen's nearby property on the day in question, that the Harrises sustained plant and tree damage from Stam, and that his opinion was that BFS's application of Stam to the Thigpen field had drifted onto the Harris property. Cauley's report further reflected that Thigpen had "instructed BFS to put the spray on Thigpen's rice field on the morning of May 4, 1996, regardless of the weather."

 We are mindful of the rule that expert testimony qualifies as substantial evidence unless it is shown that the opinion is without a reasonable basis. *See Ozark Gas Pipeline Corp. v. Arkansas Publ. Serv. Comm'n*, 342 Ark. 591, 29 S.W.3d 730 (2000). We also are guided by the rule that gives the Plant Board the prerogative to believe or disbelieve any witness and to decide what weight to accord the evidence. *Carlson*, 334 Ark. at 618. While our review of the record reflects evidence that could have supported a finding that BFS complied with the Stam 4E warning label in issue, there, too, is compelling evidence to support the decision that the Board made. Accordingly, we affirm the Board's decision.

The Board next contends that the $400.00 fine it imposed against BFS was not in error. Under Ark. Code Ann. § 2-16-203(b), the Plant Board may, in a lawful proceeding respecting licensing as defined in the Administrative Procedure Act, §§ 25-15-201 *et seq.*, in addition to or in lieu of any other lawful disciplinary action, assess a civil penalty of not more than one thousand dollars ($1,000) for each violation of any statute, rule, or order enforceable by the State Plant Board. That statute also directs the Board to establish a schedule designating the minimum and maximum civil penalties to be assessed for violations of statutes, rules, or orders over which the Board has regulatory control. Ark. Code Ann. § 2-16-203(b)(2). Accordingly, the Board adopted its own set of Pesticide Enforcement Response Regulations, which include a "penalty matrix," a graph by which the Board determines the nature of a violation and assesses its severity and the appropriate sanction. For example, the violation at issue here is using a pesticide in a manner inconsistent with the registered label. The penalty matrix indicates

that for such a violation, at the first level of enforcement, a warning letter is a proper penalty, if the violation is a minor one.[2] If the violation is major, the Board may impose a fine of between $200 and $600 at this level. At the second level of enforcement, however, the Board may impose a fine in an amount between $400 and $800.

BFS urges that the May 4 incident should not be subject to the second level of enforcement, because it occurred prior to the May 17, 1996, violation for which BFS received a warning letter. Because the May 4 event was a "prior" violation, and not a "subsequent" one, BFS argues, the May 17 violation should not have been taken into consideration when the Board assessed the second-level civil penalty against him.

In response, the Board directs us to *Walker v. State*, 314 Ark. 628, 864 S.W.2d 230 (1993), where this court held that it was appropriate to sentence the defendant as a habitual offender, even though his "prior" felony convictions arose in part from a crime that occurred *after* the one for which he was found to be a habitual criminal. The court wrote that there was "no question that had the prosecutor filed two informations, which was clearly within his authority, the first conviction would have been admissible for enhancement purposes irrespective of the fact that the conduct at issue in the first trial occurred after the conduct at issue in the case at bar." *Walker*, 314 Ark. at 631.

■ We agree that the reasoning of *Walker* should control here. Thus, even though the conduct at issue in the first disciplinary proceeding (the May 17 incident) occurred after the conduct at issue in the case at bar (the May 4 incident), that earlier sanction was "admissible for enhancement purposes," even though it was for an action that occurred later in time. For the reasons set out above, we affirm the rulings of the Plant Board.

---

[2] A "minor" violation is defined as one that "does not involve human health, safety, or endanger the environment. A "major" violation is one that "affects human health, safety, or the environment."