PINE BLUFF FOR SAFE DISPOSAL; Chemical Weapons Working Group, Inc.; Vietnam Veterans of America—Arkansas State Council, Inc.; Arkansas Women's Action for New Directions; and the Vietnam Veterans of America Foundation *v.* ARKANSAS POLLUTION CONTROL and ECOLOGY COMMISSION; Washington Demilitarization Company; United States Army, Pine Bluff Arsenal; and Arkansas Department of Environmental Quality

02-885 127 S.W.3d 509

Supreme Court of Arkansas
Opinion delivered October 30, 2003

564

*Mick Harrison* (Berea, Kentucky), *Gregory Ferguson* (North Little Rock), and *Richard E. Condit* (Washington, D.C.), for appellants.

*Mike Beebe*, Att'y Gen., by: *Charles L. Moulton*, Senior Ass't Att'y Gen., for appellee Arkansas Pollution Control and Ecology Commission.

*Jennifer H. Tucker*, for appellee Arkansas Department of Environmental Quality.

*Mitchell, Williams, Selig, Gates & Woodyard*, by: *Allan Gates* and *Marcella J. Taylor*; and *Steve A Weaver* (*of counsel*), for appellee Washington Demilitarization Company.

*Thomas L. Sansonetti*, Ass't Att'y Gen. (Washington, D.C.); *Wendy L. Blake* and *Mark R. Haag* (Washington, D.C.); and *Cpt. Chin-Zen L. Plotner* (*of counsel*, Arlington, Virginia), for appellee United States Army.

Donald L. Corbin, Justice. This case involves the issuance of two permits authorizing the construction and operation of the Pine Bluff Chemical Agent Disposal Facility, which will be used to dispose of chemical weapons currently being stored at the Pine Bluff Arsenal. The permits were issued in January 1999, by the Arkansas Department of Environmental Quality (ADEQ). Their issuance was affirmed by the Arkansas Pollution Control and Ecology Commission, and the Commission's decision was subsequently af-

firmed by the Jefferson County Circuit Court. It is from the circuit court's ruling that Appellants have brought the instant appeal. Appellants in this action are Pine Bluff for Safe Disposal; Chemical Weapons Working Group, Inc; Vietnam Veterans of America-Arkansas State Council, Inc.; Arkansas Women's Action for New Directions; and the Vietnam Veterans of America Foundation. Appellees are the Commission, ADEQ, the United States Army, and the Army's contractor, Washington Demilitarization Company (WDC).[1] This appeal was certified to us from the Arkansas Court of Appeals as presenting an issue of substantial public interest. Our jurisdiction is thus pursuant to Ark. Sup. Ct. R. 1-2(b)(4). We find no error and affirm.

*Background and Procedural History*

The record reflects that in 1985, Congress directed the United States Department of Defense to destroy the nation's stockpile of chemical weapons, located at eight different sites across the country and one site on Johnston Island. Congress also passed legislation prohibiting the transportation of any part of the stockpile from its current location. In 1997, the United States government signed the Chemical Weapons Convention Treaty, which requires the United States to destroy its stockpile of chemical weapons within ten years, or by April 2007.

At the time, the nation's stockpile consisted of approximately 30,000 tons of chemical weapons. There are approximately 3,850 tons of chemical weapons stored at the Pine Bluff Arsenal. They include the nerve agents VX and GB (known as Sarin) and the blistering agents HD and HT (known as mustard gas). The United States Army is the agency responsible for overseeing the destruction of the chemical weapons.

As of May 8, 2000, the date of the administrative order in this case, there were two other sites where the Army was actively destroying weapons. The first site established by the Army was on Johnston Island, which is located in the Pacific Ocean, about 700 miles southwest of Hawaii. The Johnston Island site had destroyed 1,678 tons of chemical-agent munitions, approximately eighty-

---

[1] At the time of the administrative hearing in this case, the Army's contractor was Raytheon Demilitarization Company.

three percent of its stockpile.[2] The second site was in Tooele, Utah, which had destroyed 2,970 tons of chemical agent, approximately twenty-one percent of its stockpile. Two additional facilities were being constructed in May 2000 in Anniston, Alabama, and Umatilla, Oregon.

Destroying the stockpile at the Pine Bluff Arsenal requires the Army to build and operate a hazardous-waste treatment, storage, and disposal facility. The Pine Bluff Facility will follow a standardized design by the Army and will look very much like the facility in Tooele. The Facility will be located at the Arsenal, approximately three miles from the current weapons-storage area. Destruction of the chemical weapons is a five-step process. The first step involves transporting the munitions from their storage areas to the Facility. The second step requires the Army to separate the chemical agent from the munitions. This step will be accomplished in a room specially designed to contain any accidental explosion. Once separated, the chemical agent is stored in a tank in a toxic cubicle, which is a room specially designed to withstand an earthquake. The third step is the actual incineration of the chemical agent and the decontamination and destruction of the munitions.

The fourth step in the destruction process is the prevention and abatement of pollution. This is the step at issue in this case. As part of this step, each of the Facility's four furnaces will have its own pollution-abatement system. The liquid incinerator, where the chemical agent is destroyed, the deactivation furnace, where the munitions are destroyed, and the metal-parts furnace, where the storage containers are destroyed, will each use a "wet" pollution-abatement system, which will incorporate a quench tower, a scrubber tower, a demister vessel, and a carbon-filter system to remove particulate, acid gases, and any remaining concentrations of organic vapors. The dunnage incinerator, where the Army will destroy the wooden pallets and other miscellaneous storage items that might become contaminated, will use a "dry" pollution-abatement system, which will incorporate a baghouse, a quench tower, another baghouse, and a dedicated stack to remove particulate and acid gases. In addition to these measures, the Facility will be designed so that the rooms are broken down into

---

[2] Since the completion of the proceedings below, the Army has successfully completed the incineration of the entire Johnston stockpile.

different ventilation categories, to maintain the containment of chemical agent through a negative-pressure ventilation system.

The carbon-filter system is designed to reduce low-level emissions of products of incomplete combustion, such as dioxin and furans, that may be present in the exhaust stream. In the event of an upset condition to the furnace, which may result in the incomplete destruction of a chemical agent, the carbon-filter system is designed to capture the chemical agent as it passes through the pollution-abatement system. Thus, the carbon-filter system is designed to prevent contaminants from entering the atmosphere.

The fifth and final step in the destruction process is the disposal of waste streams, such as scrap metal in the form of decontaminated shipping drums, storage tanks, or miscellaneous metal items recovered from the deactivation furnace. Such decontaminated scrap metal will be sold to the public. Other waste streams consist of decontaminated fiberglass residue, dunnage ash, and brine salts. These residues will be packaged and shipped to a hazardous-waste landfill. The entire destruction process will be monitored by the Army, to ensure the protection of human life by detecting chemical agents, if any, within the Facility and on the perimeter of the Facility. The Army will use two different monitoring systems, using gas chromatography, to check for the presence of chemical agents in the air and in the stack.

In 1985, the Army began the process of obtaining an air permit and a hazardous-waste permit from ADEQ. The Army then set about compiling data and performing risk assessments for the permits. A risk assessment consists of a screening evaluation to detect any potential human-health risks or ecological impact from the proposed Facility. It is the applicant's responsibility to conduct the risk assessment; however, it is ADEQ that is responsible for developing a protocol, which gives the applicant a set of instructions to follow in conducting the risk assessment. Among other things, the protocol prescribes where the emissions data is to come from, the parameters that are required from toxicological data bases, the reference doses, and all the calculations and equations the applicant is to use in conducting the risk assessment.

The protocol for the current permits was formulated following a five-day meeting in August 1997, between members of ADEQ's hazardous-waste division and its air division, persons from Region 6 of the Environmental Protection Agency (EPA),

and persons from the Army. The meeting produced a decision to have the Army follow the EPA's December 1994 combustion-risk-assessment guidance. In addition, ADEQ made the following three requirements: (1) a specific assessment for breast-feeding infants; (2) an evaluation of residents and workers based on short-term exposure, even though the EPA's guidance only required evaluation for long-term exposure; and (3) an ecological evaluation. These three requirements went beyond what the Army had previously done regarding the other facilities.

The Army submitted its Final Screening Risk Assessment in November 1997. It examined the health effects from breathing the air, eating food and soil, and drinking water exposed to the air emissions for all people residing within thirty miles of the Arsenal. It examined the effects of operating the incinerators over time on animals, plants, the land around the Arsenal, and the local bodies of water. Because they had no emissions data from the Facility at issue, the Army used that from the Johnston Island facility.

ADEQ, along with the Arkansas Department of Health and the EPA, reviewed the final risk assessment. In December 1997, ADEQ approved the risk assessment. On January 15, 1999, ADEQ issued to the Army a hazardous-waste permit and an air permit. Both permits were issued based on the Army's final risk assessment.

On February 12, 1999, a third-party request for Commission review of the permits was filed by Appellants. A hearing was held on their request beginning on September 13, 1999, and continuing through September 30. The Administrative Hearing Officer (the AHO) took testimony from fourteen witnesses and viewed ninety-three exhibits. On May 8, 2000, the AHO entered an order concluding that the air permit and the hazardous-waste permit will adequately protect the public health and the environment, and that the evidence demonstrated that the permitting decisions were not arbitrary, capricious, or in violation of the law.

Appellants then sought review from the Commission. After hearing oral arguments on the matter, the Commission voted to adopt, without modification, the AHO's recommended decision. The Commission's order was entered on July 21, 2000. Appellants then appealed to the circuit court, wherein the parties were allowed to submit briefs on the issues. In an order entered on April 24, 2002, the circuit court upheld the Commission's decision, concluding that the decision to issue the permits was thorough and

well reasoned and was supported by overwhelming evidence. Appellants filed their notice of appeal on May 24, 2002.

Appellants raise five points for reversal. The first two points are challenges to the factual and legal basis for the Commission's decision, while the last three concern pretrial rulings. First, Appellants contend that the Pine Bluff Facility will create air pollution, with regard to dioxin and furan emissions; mercury emissions; chemical warfare agent and agent byproduct emissions; and emissions resulting from products of incomplete combustion. Second, they assert that the Commission's decision violates state and federal law, as well as the Commission's own regulations, in that the permits do not contain adequate conditions to protect the public health and environment. Third, they argue that the Commission erred in dismissing their environmental-justice claim. Fourth, they argue that the Commission erred in dismissing their claim that the permit applications were incomplete. Fifth, they argue that the Commission erred in dismissing two additional arguments for the reason that they were not contained in their request for Commission review.

### Standard of Review

■■ When reviewing administrative decisions, we uphold such decisions if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *Hamilton v. Arkansas Pollution Control & Ecology Comm'n*, 333 Ark. 370, 969 S.W.2d 653 (1998); *Enviroclean, Inc. v. Arkansas Pollution Control & Ecology Comm'n*, 314 Ark. 98, 858 S.W.2d 116 (1993). The appellate court's review is directed, not toward the circuit court, but toward the decision of the agency, because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *Id.*

■■ In determining whether a decision is supported by substantial evidence, we review the record to ascertain if the decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* In doing so, we give the evidence its strongest probative force in favor of the administrative agency. *Id.* The question is not whether the testimony would have supported a contrary finding, but whether it

supports the finding that was made. *Arkansas Bd. of Exam'rs v. Carlson*, 334 Ark. 614, 976 S.W.2d 934 (1998). Expert testimony qualifies as substantial evidence unless it is shown that the expert opinion is without a reasonable basis. *Arkansas State Plant Bd. v. Bullock*, 345 Ark. 373, 48 S.W.3d 516 (2001). As true for any other factfinder, it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord the evidence. *Id.*; *Carlson*, 334 Ark. 614, 976 S.W.2d 934.

■ The requirement that the agency's decision not be arbitrary or capricious is less demanding than the requirement that it be supported by substantial evidence. *Enviroclean*, 314 Ark. 98, 858 S.W.2d 116; *In Re: Sugarloaf Mining Co.*, 310 Ark. 772, 840 S.W.2d 172 (1992). To be invalid as arbitrary or capricious requires that the agency's decision lacks a rational basis or relies on a finding of fact based on an erroneous view of the law. *Id.* Where the agency's decision is supported by substantial evidence, it automatically follows that it cannot be classified as unreasonable or arbitrary. *Enviroclean*, 314 Ark. 98, 858 S.W.2d 116; *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992).

■ Appeals from the decisions of the Arkansas Pollution Control and Ecology Commission are not governed by the procedures established in the Arkansas Administrative Procedure Act. *See* Ark. Code Ann. § 25-15-202(2)(C) (Supp. 2003). Rather, specific procedures are provided in Ark. Code Ann. §§ 8-4-222 to -229 (Repl. 2000). Section 8-4-229(a) provides that in any appeal involving a decision by the Commission, "the action of the commission shall be prima facie evidence reasonable and valid, and it shall be presumed that all requirements of the law pertaining to the taking thereof have been complied with." All findings of fact made by the Commission shall be prima facie evidence of the matters stated therein. *See* section 8-4-229(b). The burden of proving the contrary rests upon the party challenging the Commission's action. *See* section 8-4-229(c). Thus, to reverse an action of the Commission, it is the appellant's burden to rebut the presumption that the Commission's decision is reasonable and valid and has complied with all the requirements of the law. With this standard in mind, we review Appellants' arguments.

### I. Commission's Decision is Arbitrary and Contrary to Law

For their first point on appeal, Appellants argue that the Commission's decision to affirm the issuance of the air and hazardous-waste permits was arbitrary and contrary to law. They contend that ADEQ erred in issuing the permits without adequately addressing the issues of risks resulting from emissions of dioxin, mercury, and products of incomplete combustion (PICs). They contend that these emissions will cause air pollution, as defined in Ark. Code Ann. § 8-4-303(5) (Repl. 2000), which provides:

> "Air pollution" means the presence in the outdoor atmosphere of one (1) or more air contaminants in quantities, of characteristics, and of a duration *which are materially injurious, or can be reasonably expected to become materially injurious to human, plant, or animal life or to property, or which unreasonably interfere with enjoyment of life or use of property* throughout the state or throughout the area of the state as shall be affected thereby[.] [Emphasis added.]

We discuss each type of emission separately.

### A. Dioxin

Appellants start with the proposition that dioxin is highly toxic to humans and animals, and that Appellees have admitted as much. They then contend that the level of dioxin that will be emitted from the Pine Bluff Facility, in addition to amounts already existing in the area, is reasonably expected to cause adverse health effects. They argue that the health risks are especially high for breast-feeding infants, minorities, and low-income persons. To a large degree, Appellants rely on a document from the EPA, which proposed a reference dose for dioxin of one picogram per kilogram of weight per day, or 1 pg/kg/day.

■ Appellants' reliance on this standard is misplaced, because the record demonstrates that the EPA never adopted this reference dose, which was found in a document known as the 1994 Draft Dioxin Reassessment. The Draft's cover page specifically cautions: "Draft — Do not Quote or Cite." The draft proposal was never adopted by the EPA and was, in fact, criticized by the EPA's independent Scientific Advisory Board (SAB). Specifically, the SAB concluded that the EPA had not presented adequate scientific findings that would support its conclusion that adverse

effects in humans may be occurring at or near current dioxin-exposure levels. The SAB's conclusion was supported by the expert testimony in this case.

Dr. Phillip Guzelian, an expert in the field of toxicology, testified that during the 1970s, there was concern among medical scientists that dioxin might cause cancer and other adverse effects in humans. He stated that "those old fears have been replaced by the new facts," showing that even persons exposed to dioxin at high doses are not developing adverse health effects. He explained that the only adverse effect clearly shown to be caused by dioxin is chloracne, a very disfiguring and persistent form of acne. He stated that to cause that adverse effect, a person would have to have a blood level of dioxin of one thousand parts per trillion. Dr. Guzelian testified that the level of dioxin expected to be emitted from the Pine Bluff Facility is far less than that amount. To illustrate this point, he considered the study done by Dr. Morris Cranmer on the dioxin levels in the blood of persons living near the Vertac hazardous-waste incinerator in Jacksonville, Arkansas.

Dr. Cranmer's study measured the blood levels in 1991, before the incinerator began to burn, and found an average of 3.8 parts per trillion. During the incineration, in 1994, the average blood level was determined to be 3.9 parts per trillion. Finally, after the incineration was completed, in 1995, the average blood level was found to have decreased to 3.5 parts per trillion. Dr. Guzelian used this study in calculating the assessed risks of dioxin exposure from the Pine Bluff Facility. He concluded that the emissions from the Vertac incinerator were quite a bit higher than the expected emissions from the Facility and that, accordingly, there would be no observable change in the blood levels due to emissions from the Facility. He concluded further that the dioxin emissions from the Facility would not pose an unacceptable threat to human health to the exposed population.

Despite Dr. Guzelian's testimony that there will be no adverse health effects from the Facility's dioxin emissions, Appellants contend that the exposure to nursing infants caused by emissions from the Pine Bluff Facility, when added to those already in the atmosphere, is "virtually certain" to cause an increase in the frequency and severity of adverse health effects. They assert that ADEQ's standard of 2.4 pg/kg/day is too high because it exceeds the standard of 1 pg/kg/day taken from the EPA's 1994 draft. As explained above, this standard was never

adopted by the EPA and was, in fact, criticized by its independent advisory board. Other than this, Appellants have offered no evidence showing that ADEQ's standard will result in adverse health effects.

The AHO found that the standard was developed in conjunction with the Arkansas Department of Health, after consultation with the EPA, the Center for Disease Control (CDC), and the federal Agency for Toxic Substances and Disease Registry, and that the standard adopted for use in the risk assessment was provided to the health department from Dr. Cranmer, who conducted the study of the Vertac incinerator. The AHO found significant the fact that ADEQ received no adverse comments about the standard from any of the agencies it had consulted. The AHO also relied on the testimony of Dr. Gary Liberson, who stated that the health-risk assessment followed, and in some aspects exceeded, the EPA's guidance on the subject.

Dr. Liberson testified that ADEQ had used a "margin of error" approach in arriving at the figure of 2.4 pg/kg/day. Under this approach, emissions from a source are set at a level that will not exceed a certain percentage of the existing exposure level. Dr. Liberson stated that the dioxin emissions from the Pine Bluff Facility would increase the daily dose to the population by no more than ten percent above the daily dose (0.8 pg/kg/day) received by five percent of the state's population that has the lowest levels of dioxin. He explained that this meant that the remaining ninety-five percent of the state's population would get an increase of less than ten percent.

Dr. Liberson testified that there is a thirty-fold magnification for infant exposure from the mother's milk. Thus, using the "margin of error" approach, if the mother's marginal dose is 0.8 pg/kg/day, then the infant criteria is 2.4 pg/kg/day. He stated that this approach was conservative for a number of reasons. First, the approach assumed that the mother and the nursing infant lived on site. Second, it assumed that the mother was exposed to the additional dioxin emissions for seven to fifteen years, even though the Facility is only scheduled to operate for three and one-third years. Third, the expert testimony showed that as the mother nurses, she depletes her reservoir of dioxin, such that at the end of the nursing period, there is about an eighty percent reduction of the dose. Thus, the daily level of dioxin exposure to the nursing infant actually decreases. Finally, because it takes the mother seven

to fifteen years to build up this reservoir, any succeeding children would intake a smaller dose than the first child.

The AHO concluded that Appellants had failed to demonstrate that the risks from exposure to dioxin emitted from the Facility were not properly considered by ADEQ before it issued the permits. The AHO's order reflects:

> The risk assessment adequately considered the health effects of dioxin due to predicted emissions from the [Pine Bluff Facility] and existing sources. The AHO concludes that the [ADEQ] evaluation of dioxin through the risk assessment process was protective of the public health and the environment. In addition, the AHO finds no evidence that [ADEQ] acted arbitrarily, capriciously or in violation of any statute or rule.

Appellants have failed to show that this ruling is not supported by substantial evidence, especially considering the expert testimony given by Drs. Guzelian and Liberson. As stated above, expert testimony qualifies as substantial evidence unless it is shown that the expert opinion is without reasonable basis. *See Bullock*, 345 Ark. 373, 48 S.W.3d 516. No such showing was made by Appellants.

### B. Mercury

Appellants next contend that the levels of mercury to be emitted from the Pine Bluff Facility will constitute air pollution in that they will be harmful to wildlife and the environment. They do not contend that the mercury levels will be harmful to humans. They base their argument on what they claim is ADEQ's abandonment of Arkansas' Water Quality Standards in favor of the standard established by the federal Food and Drug Administration (FDA), which is one part mercury per one million parts water.

Appellees assert that ADEQ never abandoned its standard. The record reflects that the Army was first required to perform a health-risk assessment to consider risks for cancer and long-term and short-term noncancer risks. The assessment demonstrated that the expected mercury emissions from the Facility will not cause either cancer or noncancer risks. The Army then had to perform an evaluation of the potential effect of mercury emissions as part of an ecological assessment. The ecological assessment demonstrated that the predicted mercury emissions would not exceed the ecological risk-screening thresholds. Thereafter, ADEQ required

the Army to perform a *third* assessment to determine the potential effects of mercury emissions on water bodies in the vicinity of the Facility. Because some of the local bodies already exceeded the standard for mercury under the Arkansas Water Quality Standards, ADEQ asked the Army specifically to collect fish tissue samples from those local bodies and evaluate the potential health impacts. Those levels were then added to the expected levels from the Facility. ADEQ then compared that aggregate number to the FDA's standard of one part per million. Based on this standard, ADEQ concluded that the mercury emissions would not cause harmful effects to persons who might eat fish from the water bodies.

Appellants contend that the use of the FDA's standard is too lax and that ADEQ used it only because the state's own standards were too stringent. There is no merit to this point. The AHO found that the evidence showed that the expected mercury contributions from the Facility to the existing local water bodies "is so small that it is insignificant." By way of example, Appellees point out that then-existing mercury levels in the Arkansas River were 0.15 parts per billion. The expected contribution from the Facility's emissions was only an additional 0.00000052 parts per billion. Appellants have presented no evidence showing that such an additional amount is harmful to wildlife. Nor have they presented any evidence to rebut the presumption that the Commission's decision is reasonable and valid and complies with all legal requirements.

### C. PICs

Appellants next argue that the permits will cause air pollution in that the Pine Bluff Facility will emit products of incomplete combustion (PICs). They complain that the Army has not identified the PICs emitted from the facilities at Johnston Island and Tooele, Utah, and that the Army has no procedure in place to identify them. Absent a determination of their identity and toxicity, if any, Appellants assert that it cannot be determined whether these emissions will cause air pollution.

The AHO found that every combustion source will have PICs and that, generally, the same PICs are found in any combustion system. Phil Murphy, an engineer with ADEQ, testified that the emissions that come out of the stack are primarily made up of water, nitrogen, carbon dioxide, oxygen, and PICs. He stated that

only one percent of the constituents coming out of the stack are PICs. He stated further that he would expect to find the same types of PICs as those found at the Johnston Island facility. The AHO found that ADEQ deals with PICs by writing permits that minimize their formation through good combustion. For example, one of the conditions to the permits issued for the Pine Bluff Facility requires the permittees to perform a total organic carbon test during the trial burn of the Facility. This method separates a sample into three different portions and analyzes the organic carbon in each, allowing ADEQ to quantify some PICs such as chlorinated dioxins and furans.

Based on this evidence, the AHO concluded that the risk assessment considered the risk posed by PICs, and that ADEQ employed this information in drafting the permit conditions addressing PICs. We must affirm this conclusion because Appellants have presented no evidence to the contrary, beyond their bare allegations that the unidentified PICs will cause pollution.

In sum, Appellants have failed to meet their burden of showing that the Commission's decision affirming the issuance of the·air and hazardous-waste permits is erroneous. Moreover, they have failed to demonstrate that the issuance of the permits for the Facility will cause air pollution, as defined in section 8-4-303(5). To the contrary, the evidence clearly demonstrates that the expected emissions will not be materially injurious to human, plant, or animal life or to property and will not unreasonably interfere with the enjoyment of life or the use of property in the area. Thus, we conclude that the Commission's decision is supported by substantial evidence. As such, we need not decide whether it is arbitrary, because it automatically follows that where substantial evidence is found, a decision cannot be classified as unreasonable or arbitrary. *See Enviroclean*, 314 Ark. 98, 858 S.W.2d 116; *Wright*, 311 Ark. 125, 842 S.W.2d 42.

## II. Permit Conditions

In addition to their argument that the permits will result in air pollution, Appellants argue that the Commission erred in affirming the permits on the ground that they do not contain conditions necessary to adequately protect public health and the environment. They claim that the lack of conditions violates both

state and federal law. Specifically, they rely on a section from the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C § 6925(c)(3) (2000), and the Commission's own Regulations No. 8 and No. 23. Each of the cited provisions state that all permits issued shall contain such terms and conditions as the Administrator or Director determines necessary. Appellants argue that the permits in this case do not provide necessary conditions to protect against toxic emissions of dioxin, mercury, and chemical warfare agents and their byproducts.

In contrast, ADEQ asserts that there are clear conditions provided in these permits, most notably the requirement that the permittees conduct a ·trial burn at the Pine Bluff Facility to determine if it will function as expected. ADEQ also points to the fact that there are a number of asterisks contained in the hazardous-waste permit. This is because the final conditions for all the units will become effective *only* after the trial burn is completed and approved, and the permit is modified to include all of the conditions and operating standards established during the trial burn. At that point, there will be an additional opportunity for public comments.

The permits actually provide for two trial burns. The first will involve the burning of a surrogate compound, not the chemical agents themselves, which is harder to burn than the agent. If this trial burn of harder compounds results in good combustion, it would be expected that there would be good combustion for the easier-to-burn agents. Once the Facility demonstrates proper operation and the required destruction and removal efficiency while burning the surrogate compounds, the second trial burn will be conducted using the actual chemical agents. According to ADEQ, once these trial burns are complete, the risk assessments completed by the Army will be reevaluated, and public comments will be taken. Thus, the permittees will have to demonstrate again that they can meet all the permit requirements.

In addition to this important condition, the AHO found that there were a number of general conditions (like that requiring the facility to be operated according to state law) and more than twenty specific conditions (like that limiting the facility to no visible emissions and that prohibiting the release of untreated chemical agents) contained within the permits. Appellants have failed to show that the Commission erred in affirming the air and hazardous-waste permits as they are. The statutory and regulatory

provisions that they rely on require only such conditions as ADEQ *determines necessary*. Appellants have not shown that any further conditions are needed. Accordingly, we affirm the Commission's order on this point.

### III. Environmental-Justice Claim

For their third point on appeal, Appellants argue that the Commission erred in dismissing their environmental-justice claim, brought pursuant to the President's Executive Order on Environmental Justice and Title VI of the Civil Rights Act of 1964. The record reflects that this issue was raised by Appellants during the public comment period. Specifically, Appellants charged that the Pine Bluff Facility will create new, and exacerbate existing, disproportionate pollution impacts on minority and low-income populations.

ADEQ filed a motion to dismiss this claim pursuant to Ark. R. Civ. P. 12(b)(1) on the ground that the Commission lacked jurisdiction to hear it. ADEQ argued that the proper forum for such a claim is in the EPA's Office of Civil Rights or in the federal courts. ADEQ also pointed out that Appellants had filed a similar complaint alleging civil-rights violations with the EPA. The AHO concluded that the Commission lacks jurisdiction to hear and decide civil-rights claims.

On appeal, Appellants argue that the Commission misunderstood their claim to be an independent civil-rights claim. They contend that it was only offered as a subset of their claims regarding the Commission's failure to impose adequate permit conditions. Accepting their contention at face value, it is not necessary for us to review the Commission's decision to dismiss the claim. Moreover, because we have already concluded that the Commission's decision is supported by substantial evidence, we may dispose of this argument summarily. Given that there is substantial evidence to support the AHO's conclusion that the permits will adequately protect the public health and environment and that no adverse health effects to *any persons* will result from the Facility's emissions, it logically follows that there will be no adverse impact on minorities and low-income persons. Accordingly, Appellants are entitled to no relief on this point.

## IV. Incomplete Permit Application

For their fourth point on appeal, Appellants argue that the Commission erred in dismissing their claim that the permits were issued based on incomplete applications. This claim was dismissed in the AHO's order dated June 3, 1999. That order reflects that on April 15, 1999, a preliminary hearing was held, pursuant to Ark. Code Ann. § 8-4-205(c)(1)(A) (Repl. 2000). The statutorily provided purpose of such a hearing is for the AHO to determine whether the parties qualify as proper parties under section 8-4-205(b)(1) and whether the request conforms with the requirements under subsections (b)(2) and (b)(3). The AHO's order reflects that the claim was dismissed because Appellants did not raise the issue in their comments submitted during the public comment period. Section 8-4-205(b)(2) provides in pertinent part:

> No interested party requesting a hearing under subsection (b) of this section may raise any issue in the hearing that was not raised in the public comments unless the party raising the issue shows good cause why such issue could not, with reasonable diligence, have been discovered and presented during the public comment period.

Appellants do not deny that they failed to raise this issue in their comments, and they do not claim that this issue could not have been presented during the public-comment period. Notwithstanding, they assert that it was error for the AHO to dismiss the claim because it is one of subject-matter jurisdiction that goes beyond mere technical compliance. Appellants have failed to cite to any legal authority that would support this novel proposition. Likewise, they have failed to make a convincing legal argument. This court has stated on occasions too numerous to count that it will not consider the merits of an argument if the appellant fails to cite any convincing legal authority in support of that argument, and it is otherwise not apparent without further research that the argument is well taken. See Utley v. City of Dover, 352 Ark. 212, 101 S.W.3d 191 (2003); Stilley v. James, 347 Ark. 74, 60 S.W.3d 410 (2001). We thus affirm on this point.

## V. Issues Not Contained in Request for Hearing

For their fifth and final point, Appellants argue that the Commission erred in dismissing two of their claims on the ground that they were not raised in their request for review. The first claim

was that Raytheon Demilitarization Company, the Army's initial contractor on this project, would not operate and maintain the Pine Bluff Facility in compliance with the permits and applicable law. The second claim was that the Army's emergency response and contingency planning is inadequate.

On April 15, 1999, the AHO held a preliminary hearing, pursuant to section 8-4-205(c)(1)(A). As stated in the previous point, the purpose of such a hearing is for the AHO to determine whether the parties qualify as proper parties under section 8-4-205(b)(1) and whether the request conforms with the requirements under subsections (b)(2) and (b)(3). Subsection (b)(3) provides: "A request for a hearing shall identify the permit action in question and its date *and must include a complete and detailed statement identifying the legal and factual objections to the permit action*." (Emphasis added.)

Pursuant to this statutory provision, the AHO entered an order on June 3, 1999, dismissing the aforementioned claims. The AHO found that these two arguments had not been specifically raised in Appellants' request, but were, instead, merely incorporated by reference into the request. The AHO concluded that "incorporating comments by reference into a request for Commission review does not identify the legal and factual objections to a permit with the specificity and detail required by the applicable statute and regulations."

 We affirm the AHO's conclusion, as it tracks the clear and precise language of section 8-4-205(b)(3). This court has consistently held that the interpretation given a statute by the agency charged with its execution is highly persuasive. *See Arkansas State Medical Bd. v. Bolding*, 324 Ark. 238, 920 S.W.2d 825 (1996); *Pledger v. Boyd*, 304 Ark. 91, 799 S.W.2d 807 (1990). Thus, while an agency's interpretation is not conclusive, it will not be overturned unless it is clearly wrong. *Id.* Section 8-4-205(b)(3) provides that any request for hearing *must* include a complete and detailed statement identifying the legal and factual objections to the permit action. This requirement is echoed in the Commission's Regulation No. 8, section 2.5.3(b)(2), which provides that a third-party request for Commission review shall include:

(C) *A complete and detailed statement identifying the legal issues and factual objections*;

(D) *Any available evidence, including exhibits or affidavits.* If a public comment period was provided and the evidence was not presented, provide a statement of the reasons for failure to present the evidence[.] [Emphasis added.]

Appellants admit that their request did not mention these claims specifically; rather, they assert that the claims were stated in an incorporated attachment to the request. Under the clear language of the statute and the foregoing regulation, Appellants' claims were not properly raised for review.

Affirmed.