FORD MOTOR COMPANY *v.* ARKANSAS MOTOR
VEHICLE COMMISSION and Crain Automotive Holdings, LLC

03-496                                           161 S.W.3d 788

Supreme Court of Arkansas
Opinion delivered April 29, 2004

[Rehearing denied June 3, 2004.]

*Rose Law Firm*, by: *David L. Williams* and *John D. Coulter*; and *Sutherland, Asbill & Brennan LLP*, by: *Thomas W. Curvin* and *Kelly J. Baker*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Arnold M. Jochums*, Ass't Att'y Gen., for appellee AMVC.

*Mitchell, Blackstock, Barnes, Wagoner, Ives & Sneddon*, by: *Michael W. Mitchell*; and *Myers & Fuller, P.A.*, by: *Loula M. Fuller* and *Daniel E. Myers*, for intervenors.

DONALD L. CORBIN, Justice. Appellant Ford Motor Company appeals the order of the Arkansas Motor Vehicle Commission (AMVC) fining it $10,000 for refusing to approve the sale of a Ford dealership to Appellee Crain Automotive Holdings, LLC. On appeal, Ford argues that the Commission erred in (1) excluding certain evidence; (2) ignoring Ford's generally applicable

criteria for dealer candidates; (3) denying Ford's motion that pro-dealer commissioners recuse from the case; and (4) failing to follow its own rules. This case was certified to us from the Arkansas Court of Appeals, as raising an issue of first impression; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We reverse the decision of the Commission.

This case stems from Ford's refusal to allow Crain to purchase the assets and inventory of Fletcher-Tate Ford. On August 14, 2001, Fletcher-Tate and Crain entered into an Asset Purchase Agreement, which in turn was submitted to Ford for approval. Pursuant to its franchise agreement, Ford retained the right to grant or withhold consent of the sale of an existing Ford dealership to any third party. In evaluating dealer candidates, Ford uses four generally applicable criteria: capital, capacity, customer satisfaction, and character. On August 31, 2001, Mr. Leo Cumberlich, Ford's Regional Sales Manager, notified Fletcher-Tate that it would not approve Crain as a replacement dealer. In this letter, Cumberlich stated that Crain failed to meet three of the four criteria used by Ford in evaluating new dealers. The letter specifically stated that Crain failed to satisfy the following criteria:

> Character and Capacity — Two individuals proposed in the ownership structure of Crain Ford, LLC, Larry Crain, Jr., proposed President, and Larry Crain, Sr., were principal owners at Midway Ford, Inc. when Ford issued a notice of termination. In addition to ownership, Larry Crain, Sr. had Managerial Authority at Midway Ford, Inc. when Ford issued a notice of termination.

> Capacity — Market share performance at Crain Ford Lincoln Mercury, where Larry Crain, Sr. and Larry Crain, Jr. are both owners with Managerial Authority, is deficient. Retail car share is below Regional average while retail truck share is far below (only 79% of) Regional average and (only 76% of) National average.

> Customer Satisfaction — Crain Ford Lincoln Mercury is significantly below group average on one of the key questions on the Customer Viewpoint Ownership Survey:

| Ownership Survey (Q3f) Satisfaction with the waythis Dealership has treated you as a customer: | Dealer | Group | Top 10% |
|---|---|---|---|
| | 42 | 61 | 72 |

At the time that Ford turned down Crain's request to buy the Fletcher-Tate dealership, Crain owned a Ford dealership in

Benton, Arkansas. Crain previously owned a Ford dealership, Midway Ford, in Memphis, Tennessee. On March 3, 1998, Ford notified Crain that it was seeking to terminate its ownership of Midway Ford as the result of three separate audits indicating that Midway Ford had committed repeated instances of warranty fraud against Ford.

After Ford refused to approve Crain's purchase of Fletcher-Tate, Crain filed a complaint before the Commission, alleging that Ford's refusal to approve the sale violated Ark. Code Ann. § 23-112-403(a)(2)(I) (Repl. 2004), which sets forth the requirements a manufacturer must follow when disallowing the sale or transfer of a dealership. In its complaint, Crain averred that Ford had intentionally misrepresented Crain's performance in order to refuse approval of the sale. Ford answered by stating that Crain lacked standing to pursue some or all of the claims, because a prospective transferee may not challenge a manufacturer's decision to turn down an application for a replacement dealer. Ford also stated that its reasons for rejecting Crain's proposed purchase of Fletcher-Tate were valid and based on established criteria.

A hearing before the Commission was scheduled for April 26, 2002. Prior to that hearing, Crain filed a motion in limine seeking to exclude evidence related to Ford's claims that it had terminated Crain's ownership of the Midway dealership in Memphis because of instances of warranty fraud. The hearing officer ruled that Ford could introduce limited evidence to establish the fact that it claimed Crain had engaged in warranty fraud at the Midway dealership. Also considered at this pretrial hearing was Ford's motion that Commission members with a pro-dealer bias recuse from hearing the case. This motion was denied.

During the hearing before the Commission, Larry Crain Jr. testified that he owns an equity interest in Crain Automotive. He also admitted that he had been a minority-percentage owner of Midway Ford in Memphis before the dealership was sold to United Auto Group in 1999. Crain Jr. admitted that while he was an owner at Midway, the dealership was notified that Ford was going to attempt to terminate its franchise agreement. According to Crain Jr., however, no one in Arkansas had ever questioned his character or financial reputation as a result of Ford's attempt to terminate the Memphis franchise. Crain Jr. further testified that he disagreed with the reasons that Ford gave for turning down its purchase of the Fletcher-Tate dealership. He stated that he computed the capacity figures based on the most recent data available

to him at the time and came up with different figures. Crain Jr. also stated that the company's Benton dealership has several "special marketing conditions," namely that it is right next to the "Little Rock multi-point zone." Crain Jr. then testified about the performance of its Chevrolet dealership, and blamed the Benton dealership's lower truck sales on the fact that they have a smaller inventory available to customers.

On cross-examination, Crain Jr. admitted that under its dealership contract with Ford, the Benton dealership was required to "promote vigorously and aggressively the sale and retail . . . of cars and trucks . . . within the dealer's locality[.]" Crain Jr. also admitted that when the company signed up to be a Ford dealer, it was assigned a market area, known as its dealer locality, and that they are required to obtain a reasonable share of the sales in that dealer locality. According to Crain Jr., the Benton dealership is the only Ford dealership in its dealer locality. Finally, Crain Jr. admitted that he was unsure whether the Benton dealership had ever been up to regional average.

Larry Crain Sr. also testified at the hearing before the Commission. Like his son, Crain Sr. testified that no one in the Arkansas community had ever questioned his character as a result of Ford's issuance of the termination letter regarding the Midway dealership. Crain Sr. stated that initially he was an absentee owner of the Midway dealership, but then admitted that in late 1994 or early 1995, he spent about fifty percent of his working time at that dealership. He stated that he was present for the audits conducted by Ford in 1996 and 1997. He then discussed the termination letter sent by Ford in 1998 and stated that he disagreed with Ford's audit findings. He also stated that he fired Midway's general manager, because he committed fraud against the dealership, not Ford.

Testifying for Ford was Ross Peterson, Dealer Contracts Manager for Ford. Prior to becoming the Dealer Contacts Manager, Peterson served as the Regional Market Representation Manager for the Memphis region. Peterson testified that Ford decided to terminate its dealer agreement with Crain's Midway dealership after three separate audits revealed that the dealer had submitted fifty-three false or fraudulent claims for work not performed as claimed, mileage and date misrepresentations, inflated sublet towing, and unsupported repairs. According to Peterson, Crain appealed Midway's termination notice to Ford's Dealer Policy Board, which affirmed the termination. Peterson also testified that Ford applies four criteria: character, capacity, com-

mitment to customer satisfaction, and capital, when presented with a buy-sell agreement. According to Peterson, these criteria apply to a brand new dealer or someone attempting to acquire another Ford franchise. Peterson stated that if a candidate does not meet all four criteria, Ford will not approve that candidate. He stated that if a prospective buyer owns another dealership, Ford would consider what occurred at the other dealership in evaluating a candidate's character and capacity to operate a dealership. Peterson also explained that just because a candidate has a dealership that is Blue Oval certified does not mean that the dealer will qualify for another dealership. According to Peterson, there were only 246 dealers out of a total of 3,890 who had not achieved Blue Oval certification. Finally, Peterson testified that Ford had conducted market studies relating to single- and multiple-point markets and determined that Crain's Benton dealership did not belong within the Little Rock multi-point market.

Scott Ezell, Regional Market Representation Manager for Ford, also testified before the Commission. He explained that part of his job duties involved reviewing buy-sell agreements and reviewing dealer candidate applications and that he was responsible for reviewing the buy-sell agreement between Fletcher-Tate and Crain. Ezell testified that he discussed the proposal with his superiors and, after reviewing the information, it was determined that Crain did not meet three of the four criteria. Ezell reported his recommendation that the agreement be turned down to his superior, Leo Cumberlich. According to Ezell, at the time that he prepared the turn-down letter, the most current information revealed that Crain's Benton dealership was below regional average, particularly in truck sales. Ezell also explained that with regard to the customer satisfaction criteria, he referred to Ford's Market Representation Manual, introduced as an exhibit at trial. According to Ezell, based on this manual, he looked at specific questions in the sales, service, and ownership surveys. Ezell stated that Crain was well below the eighty-five percent average on a key question from the ownership survey. Also, Ezell stated that from 1996 through June of 2001, Crain was below zone average and below region average in truck-share performance and, thus, did not meet the capacity criteria. In a report ranking market share through June of 2001, Crain's Benton dealership ranked 241 out of 263 dealers for truck market share in its market area.

Leo Cumberlich, former Memphis Regional Manager for Ford, testified that at the time of the proposed agreement between Fletcher-Tate and Crain, he was responsible for reviewing changes in ownership for Ford dealerships and that he had final approval for dealer candidates. According to Cumberlich, he was aware of the fraud claims against the Midway dealership at the time that Crain sought to buy the Fletcher-Tate dealership. Cumberlich met with the Crains and informed them of what the evaluation process would entail. He then instructed Scott Ezell to review the application and give the Crains a fair look. Cumberlich testified that in his opinion, the Crain organization failed to demonstrate a proven track record, particularly in the areas of market share, customer satisfaction, and character. Cumberlich also stated that just because a dealer was performing at a level that did not warrant termination does not mean that they automatically qualify for an additional dealership.

Following the presentation of all the testimony and evidence, the Commission ordered the parties to prepare proposed findings to be submitted to the full Commission for adoption. The Commission continued the hearing until May 14, 2002, at which time each side was allowed to present oral argument before the entire Commission. Thereafter, Commissioner Bobby Ferguson, one of the commissioners who heard all the evidence, recommended that the full Commission find Ford at fault in this case. His motion was seconded. Each side then presented its arguments. At the conclusion of the arguments, the full Commission voted to hold deliberations on the record. Prior to any deliberations, Commissioner Ferguson asked that the full Commission vote on his recommendation that Ford be found at fault. The full Commission then voted to adopt Crain's version of the proposed findings of fact. Thereafter, the Commission also voted to adopt Crain's conclusions of law, specifically that Ford violated section 23-112-403 in turning down the sales agreement between Fletcher-Tate and Crain. The Commission then voted to impose a $10,000 fine on Ford, unless they approved Crain's purchase of Fletcher-Tate within ten days of the date that the order was entered.

Ford sought judicial review of the Commission's decision in the Pulaski County Circuit Court. A hearing was held on December 10, 2002, during which each side presented oral arguments to the court. In an order dated December 27, 2002, the trial court ruled that the Commission's decision was supported by substantial

evidence. The court further found that the Commission did not act in excess of its statutory authority, nor was its decision arbitrary, capricious, or characterized by an abuse of discretion. The appeal to this court followed.

Before turning to the merits of Ford's argument, we note that judicial review of a decision by the AMVC is governed by the Administrative Procedure Act (APA), Ark. Code Ann. § 25-15-212 (Repl. 2002). The appellate court's review is directed, not toward the circuit court, but toward the decision of the agency, because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *Arkansas State Police Comm'n v. Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999); *McQuay v. Arkansas State Bd. of Architects*, 337 Ark. 339, 989 S.W.2d 499 (1999). Our review of administrative decisions is limited in scope. *Williams v. Arkansas State Bd. of Phys. Therapy*, 353 Ark. 778, 120 S.W.3d 581 (2003). When reviewing such decisions, we uphold them if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *Pine Bluff for Safe Disposal v. Arkansas Pollution Control & Ecology Comm'n*, 354 Ark. 563, 127 S.W.3d 509 (2003); *Hamilton v. Arkansas Pollution Control & Ecology Comm'n*, 333 Ark. 370, 969 S.W.2d 653 (1998).

In determining whether a decision is supported by substantial evidence, we review the record to ascertain if the decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Pine Bluff for Safe Disposal*, 354 Ark. 563, 127 S.W.3d 509. In doing so, we give the evidence its strongest probative force in favor of the administrative agency. *Id.* The question is not whether the testimony would have supported a contrary finding, but whether it supports the finding that was made. *Arkansas Bd. of Exam'rs in Counseling v. Carlson*, 334 Ark. 614, 976 S.W.2d 934 (1998). As true for any other factfinder, it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord the evidence. *Id.*

The requirement that the agency's decision not be arbitrary or capricious is less demanding than the requirement that it be supported by substantial evidence. *Pine Bluff for Safe Disposal*, 354 Ark. 563, 127 S.W.3d 509. To be invalid as arbitrary or capricious, an agency's decision must lack a rational basis or rely on

a finding of fact based on an erroneous view of the law. *Id.* Where the agency's decision is supported by substantial evidence, it automatically follows that it cannot be classified as unreasonable or arbitrary. *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992).

## I. Evidence of Warranty Fraud

For its first point on appeal, Ford argues that the Commission erred in excluding evidence that Crain had committed warranty fraud at its Midway dealership in Memphis. Ford argues that this evidence had a direct bearing on two of the criteria it used in reviewing Crain's application to buy the Fletcher-Tate dealership, specifically character and capacity. The Commission and Crain both counter that the hearing officer's decision to limit the evidence related to the fraud at Midway Ford was an appropriate exercise of discretion. They further argue that the evidence Ford was prohibited from presenting was merely cumulative of evidence that it was allowed to introduce and, thus, was properly excluded, as Ford suffered no detriment by not presenting this evidence.

In partially granting Crain's motion in limine, the hearing officer stated:

> [O]ne of the concerns that I've got is that we are going to turn this entire proceeding into a warranty termination case. . . . I understand fully that Ford has allegations . . . that Mr. Crain or the people that work for Mr. Crain committed warranty fraud in Tennessee. I understand equally as well that Mr. Crain is fighting those claims.
>
> . . . .
>
> I am going to allow you to allege . . . Mr. Crain or the dealership engaged in warranty fraud and that's part of a pending case in Tennessee. I'm also going to allow Mr. Crain to come in and say, and I dispute those charges[.]
>
> . . . .
>
> [W]e are not going to try in toto the warranty fraud case before this forum, we're just not. Now, I'm going to allow certain exhibits to come in as far as what your defenses are. But, it's going to be a very truncated thing. . . . I think we would be remiss if we didn't tell the

> Commissioners about the dispute. But, while we're going to have a trial about whether or not you're right or you're right about the dispute, that's not going to be part of it.
>
> . . . .
>
> [I]f you've got one exhibit or two exhibits that succinctly state what I've already articulated as far as, we've got a dispute, here's what the dispute is, then I'd be inclined to admit those but . . . I'm not going to allow a whole lot of backup information.

The evidence that the Commission would not allow Ford to introduce consisted of testimony from the auditors who performed the audits at Midway Ford and determined that Crain had committed warranty fraud, as well as documents supporting this testimony. There was also a letter from Crain Sr. to Ford stating that he had conducted an internal audit at the Midway dealership and had, in fact, discovered instances of warranty fraud.

■ The APA speaks to the introduction of evidence during an administrative hearing. Pursuant to Ark. Code Ann. § 25-15-213(4) (Repl. 2002), "Irrelevant, immaterial, and unduly repetitious evidence shall be excluded. Any other oral or documentary evidence, not privileged, may be received if it is of a type commonly relied upon by reasonably prudent people in the conduct of their affairs." Under section 25-15-213(5), however, a party "shall have the right to conduct such cross examination as may be required for a full and true disclosure of the facts[.]" Moreover, it has been recognized that the exclusion of evidence is prejudicial where a substantial right of a party is affected. *Potter v. Magee*, 61 Ark. App. 112, 964 S.W.2d 412 (1998); *Stacy v. Lin*, 34 Ark. App. 97, 806 S.W.2d 15 (1991).

Under the Rule set forth in section 25-15-213, the hearing officer had the right to determine what evidence was appropriately submitted to the Commission. The hearing officer's rationale that he did not want to confuse the issue before the Commission was sound, with one exception. The hearing officer recognized that Ford alleged fraud, while Crain denied any such fraud, but then refused to allow Ford to introduce into evidence a letter written by Crain Sr. to Ford regarding instances of fraud at the Midway dealership. In that letter, dated June 6, 1997, Crain Sr. stated:

> We recently found it necessary to terminate the employment of our Parts and Service Director for reasons of impropriety. As a result

of some of his actions, we subsequently made an investigation of various documents and related transactions. Accordingly I am outlining the matters we reviewed and requesting that those items, where our investigation discovered evidence that repairs now determined to be out of Ford warranty policy, be billed back to Midway Ford, Inc.

In this letter, Crain Sr. admitted to uncovering fraud and requested that Ford charge the dealership for those cases; yet, when he testified at the hearing before the Commission, Crain Sr. testified that he had terminated Midway's service manage for fraud against the dealership. He denied, however, that the service manager ever submitted improper claim forms to Ford, stating specifically on cross-examination that the service manager was terminated because he "committed fraud on customer pay claims, not any claims submitted to Ford."

▪ ·Following Crain Sr.'s testimony on this issue, counsel for Ford again sought to introduce the letter, arguing that it was entitled to point out inconsistencies in Crain Sr.'s testimony. The hearing officer again denied the motion, concluding that the letter provided nothing new to the case at hand. This conclusion was in error as the letter directly conflicted with Crain Sr.'s denial of any knowledge of warranty fraud against Ford made before the Commission. Because the exclusion of this letter prejudiced Ford by affecting its right to impeach Crain Sr., the hearing officer abused his discretion in excluding this letter.

## II. Generally Applied Criteria

Next, Ford argues that the Commission erred in ignoring the generally applied criteria utilized by Ford in reviewing dealer candidates. Specifically, Ford alleges that the Commission imposed its own criteria in evaluating the issue of whether Ford violated section 23-112-403 when it refused to approve the sale of Fletcher-Tate to Crain. Crain and the Commission both argue that the Commission properly applied Ford's criteria in determining that Ford's turn down of the proposed sale violated the statute. They further argue that the fact that the Commission's objective evaluation of Ford's criteria that yielded a different result does not equate to a finding that the Commission applied the wrong criteria. We agree with Ford that the Commission erred on this point.

Pursuant to section 23-112-403(a)(2), it shall be unlawful for a manufacturer:

(I)(i) Notwithstanding the terms of any franchise agreement, to fail to give effect or to attempt to prevent any sale or transfer of a dealer, dealership, or franchise or interest therein, or management thereof, provided that the manufacturer or distributor has received sixty-days' written notice prior to the transfer or sale, and unless:

(a) The transferee does not meet the criteria generally applied by the manufacturer in approving new motor vehicle dealers or agree to be bound by all the terms and conditions of the dealer agreement, and the manufacturer so advises its dealer within sixty (60) days of receipt of the notice[.]

Thus, the issue before the Commission was whether Ford was justified in rejecting the proposed buy-sell agreement between Fletcher-Tate and Crain because Crain failed to meet three of the four criteria generally applied by Ford in reviewing dealer candidates. The criteria at issue in the present case are capacity, character, and customer satisfaction. In finding against Ford, the Commission stated that the "evidence does not support that Ford 'generally applies' the Four C's to review a proposed transfer."

### a. Capacity

With regard to capacity, the Commission concluded that Ford violated section 23-112-403(a)(2)(I) in finding that Crain failed to satisfy this criteria. Specifically, the Commission stated:

Ford's "capacity" criteria requires a "Proven track record of satisfactory sales and market share performance and successful dealership operations." In this respect, Ford applied measurements of Crain Ford Lincoln-Mercury's "retail car share" as applied to regional and national averages established by Ford. Ford took this action, notwithstanding that Ford's measurement criteria did not accurately depict or portray Crain Ford Lincoln-Mercury's true sale track record and, in fact, materially skewed and arbitrarily misrepresented such sales track record and market share performance.

The Commission stated that its conclusion in this regard was supported by undisputed evidence. This undisputed evidence consisted primarily of the testimony of Larry Crain Jr., an owner of Crain Automotive. Crain Jr. testified as to the way he believed that the market share should be determined. Specifically, he testified that the cars registered outside of Benton should be counted when determining his dealership's market share, because the Benton dealership is only six miles outside of Little Rock. In support of

this notion, both Crain and the Commission relied on a provision that Ford is required to consider "special local marketing conditions that might affect the Dealer's sales performances differently from the sales performance of COMPETITIVE or INDUSTRY CAR dealers or other authorized Ford dealers." Other than the self-serving testimony of Crain Jr., no evidence was submitted to the Commission detailing what "special local marketing conditions" entail. There was no evidence presented to the Commission that Ford had ever before considered any "special local marketing conditions" when evaluating Crain's performance. Nor was there any evidence introduced that Crain ever requested that it be evaluated pursuant to any special conditions, despite the fact that each month Crain received a "Ford Dealer Performance Report" reflecting its monthly performance, as well as its cumulative six-month performance.

██  The Commission's duty in this case was not to evaluate the appropriateness of the criteria relied on by Ford in determining whether to approve a dealer for purchase of a franchise. The Committee's duty was simply to determine if Ford was justified in refusing to approve the sale after reviewing these criteria as they related to Crain. Instead, the Commission concluded that "Ford's measurement criteria did not accurately depict or portray Crain Ford Lincoln-Mercury's true sale track record and, in fact, materially skewed and arbitrarily misrepresented such sales track record and market share performance." The Commission, thus, arbitrarily decided that the way in which Ford analyzed market share was unfair to Crain, finding instead that its sales had been satisfactory. Even applying our strict standard that we give the evidence its strongest probative force in favor of the Commission's decision, it is apparent that the Commission's decision in this regard is not supported by substantial evidence.

In a similar situation, the Supreme Court of Iowa refused to second-guess the factors utilized by Jaguar Cars after it sought to terminate a franchise following an unapproved transfer of a dealership. *See Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417 (Iowa 2002). In that case, the franchisee attempted to attack the process utilized by Jaguar in determining if a dealer was a good candidate for a Jaguar dealership. The court rejected this argument, stating:

> The administrative process triggered by Jaguar Cars' application to terminate Midwest Auto's franchise was not intended to be a forum

> to evaluate the wisdom or even the fairness of Jaguar Cars' business practices. Whether Jaguar Cars could or should have accorded Midwest Autos a face-to-face meeting and considered factors other than CSI scores before filing its application is not germane to the real issue: whether Jaguar Cars proved at the administrative hearing that Midwest Auto's operation of the Des Moines franchise would be substantially detrimental to the distribution of Jaguar motor vehicles in this area.

*Id.* at 430.

■ Likewise, in the absence of any evidence of what factors warrant application of "special local marketing conditions" or that Ford ever analyzed Crain's performance in light of such conditions, the issue of whether the Benton dealership *should have been analyzed* as a single-point or a multi-point dealership was not germane to the Commission's review of Ford's actions in this case. The evidence unarguably demonstrated that Ford classified Crain's Benton dealership as a single-point dealer and analyzed it accordingly. Crain Jr., himself, admitted on cross-examination that under the contract with Ford, the Benton dealership was responsible for obtaining a reasonable share for Ford vehicles registered and sold in its dealer locality. Peterson testified to the fact that Ford regularly conducts market surveys and that Crain knew that the Benton dealership was in a single-point market when it purchased the Benton store. Peterson also stated that Ford calculates market share for a single-point dealer anywhere in the United States the same as it calculates the share in Benton. The Commission's belief that the dealership should have been analyzed as a multi-point dealer is irrelevant; thus, it was improper for the Commission to substitute its own analysis for the established analysis typically used by Ford in these types of cases.

■ This court will not substitute its judgment for that of an administrative agency unless the decision of the agency is arbitrary and capricious. *Williams*, 353 Ark. 778, 120 S.W.3d 581. Here, the Commission's decision that Ford erroneously concluded that Crain did not satisfy the criteria of capacity was arbitrary and capricious, as it was not supported by substantial evidence and lacked a rational basis.

### b. Character

Not only did the Commission impose its own criteria with regard to market share, it also refused to consider Ford's analysis of the criteria for character. In concluding that the overwhelming weight of evidence established that "the good standing in the community and the personal and financial reputation of Larry Crain, Sr. and Larry Crain, Jr. have not been [a]ffected by the issuance of Ford's notice of termination with respect to Midway Ford, Inc. within the State of Tennessee," the Commission relied upon affidavits of friends and acquaintances of the Crains, who held them in high regard. Thus, according to the Commission, it was inherently unreasonable for Ford to imply that the allegations of fraud in Tennessee could have impacted the personal reputations of the Crains. The record fails to demonstrate, however, that when Ford undertook its analysis of Crain as an appropriate replacement dealer, it had such affidavits at hand. Again, the Commission has substituted its analysis of the Crain's character for the analysis completed by Ford. In other words, the Commission does not dispute that Ford applies the criteria of character in situations such as the present one; rather, the Commission takes issue with the manner in which Ford analyzes this criteria. In so doing, the Commission exceeded the authority granted to it by section 23-112-403.

Ford defines the criteria of character as "good standing in the community with a sound personal and financial relationship." Ford's definition of character speaks to a candidate's reputation in the community, but community is not defined. The evidence submitted to the Commission by Ford to prove that its analysis of this criteria was just demonstrated that Ford considered the community to be the business community in which both it and Crain operate. Specifically, Ford submitted testimony both from Ezell and Cumberlich relating to the allegations of warranty fraud at the Midway dealership. Ford also introduced a portion of the Dealer Policy Board's order affirming Ford's findings of fraud. Ford, however, was prohibited from impeaching Crain Sr.'s testimony that he lacked any knowledge of warranty fraud when the hearing officer improperly denied Ford's motion to introduce a letter written by Crain Sr. to Ford.

The Commission's determination that what occurred in Memphis had no impact on Crain's business dealings in Arkansas amounts to the Commission substituting its judgment for that of

Ford. Ford relied on evidence of its business dealings with Crain when it evaluated its generally applied criteria and it submitted that evidence, at least in part, to support its analysis. Just because the Commission did not believe that such allegations should impact the Crains' character does not equate to a finding that Ford improperly analyzed this criterion. The Commission's conclusion to the contrary was arbitrary and capricious.

### c. Customer Satisfaction

Finally, the Commission concluded that Ford unreasonably relied on one key question in determining that Crain failed to meet its customer-satisfaction criteria. The key question identified by Ford in its turn-down letter was from an ownership survey. According to the Commission's findings, Ford no longer even reports ownership data to its dealers because, it is not a significant factor in evaluating a dealer's performance. The Commission also relied on evidence that Crain is "Blue Oval" certified in concluding that Ford's turn down was unreasonable. The evidence presented to the Commission demonstrated that "Blue Oval" certification was provided to those dealers who achieved certain customer-satisfaction goals. Once again, however, the Commission agreed with Crain that with regard to customer satisfaction, the Benton dealership was being compared to the wrong group of dealers. In other words, the Commission again substituted its own opinion that Crain should have been treated as a multi-point dealer with regard to customer satisfaction. As we previously stated, the Commission abused its discretion in treating Crain as a multi-point dealer when the evidence established that Crain's contract with Ford classified the dealership as a single-point dealer and that Ford consistently analyzed it as such. Accordingly, the Commission's ruling that Crain satisfied the customer-satisfaction criteria was arbitrary and capricious.

In sum, the Commission's conclusions that Crain satisfied the three criteria found to be deficient by Ford were not supported by substantial evidence and lacked a rational basis. Accordingly, the Commission's decision that Ford violated section 23-112-403(a)(2)(I) was arbitrary and capricious and is, therefore, reversed.

### III. Recusal of Commissioners

As its third point on appeal, Ford argues that the Commission erred in denying its motion that commissioners with a pro-dealer bias recuse from the case. Specifically, Ford argues that several of the commissioners were themselves automotive dealers and that they would have an interest in broadly interpreting the provisions of section 23-112-403. Thus, according to Ford, the denial of its motion violated Ford's right to due process under both the United States Constitution and the Arkansas Constitution. Crain and the Commission both counter that Ford bears the burden of proving bias and failed to do so in this case. We find no error in the Commission's denial of Ford's motion to recuse.

An adjudicator is presumed to be unbiased, and in order to overcome that presumption, a litigant must show a conflict of interest or some other specific reason for disqualification. *See Withrow v. Larkin*, 421 U.S. 35 (1975). In order to establish bias, the party making the allegation must show that the decision maker "has a direct, personal, substantial, pecuniary interest in reaching a conclusion" against one of the parties to the dispute. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)).

In support of its argument that commissioners who were also automotive dealers were biased in this case, Ford relies in part on a decision by the Eighth Circuit Court of Appeals in *Yamaha Motor Corp., U.S.A. v. Riney*, 21 F.3d 793 (8th Cir. 1994). In that case, a dispute between Yamaha and one of its licensed dealers was submitted to the AMVC. At that time, one of the commissioners was a Harley Davidson dealer. That commissioner voted to impose sanctions on Yamaha, and a majority of the Commission agreed. Thereafter, Yamaha filed an action in federal district court, alleging that the Commission's vote violated its constitutional rights. In its prayer for relief, Yamaha sought an injunction to prevent imposition of the Commission's fine. The federal district court entered an order abstaining from, and dismissing without prejudice, the case based on the fact that there was an ongoing state proceeding, as well as the fact that there was no evidence of bias. On appeal, the Eighth Circuit reversed and remanded the matter to the district court, concluding that the district court's finding that there was no evidence of bias in the state proceeding was clearly erroneous. In reaching this conclusion, the court pointed to the fact that the commissioner that owned a Harley Davidson

dealership had a pecuniary interest in eliminating Yamaha as competition in the state. In addition, the court found that the commissioner had abdicated his role as adjudicator by prejudging the issues in the case. The court ultimately concluded that this commissioner's bias resulted in Yamaha being unable to obtain a hearing before a competent tribunal.

*Yamaha* is distinguishable, however, from the present case. Ford simply alleges that dealers who sit as commissioners have an interest in interpreting section 23-112-403 broadly. The record reflects that only one of the commissioners who participated and voted in this case was a dealer.[1] The remaining five commissioners were consumer members. Ford cites to comments made by the one dealer commissioner about his own experiences as a dealer, but fails to point to any actual examples of bias on the part of any particular commissioner. It simply argues that pro-dealer commissioners will vote a certain way to protect their own economic interests, specifically being able to sell a dealership to the highest bidder, regardless of the qualifications of that dealer.

A similar argument was raised and rejected in *Massengale v. Oklahoma Bd. of Exam'rs in Optometry*, 30 F.3d 1325 (10th Cir. 1994). In that case, the plaintiffs, who were optometrists and sub-leased office space from Pearle Vision and Lenscrafters, were brought before the Board of Examiners in Optometry for disciplinary action. The plaintiffs argued in part that the members of the board were biased against them and had an economic stake in the outcome of the disciplinary proceeding. In rejecting this argument, the court stated:

> Plaintiffs' argument assumes the Board members will decide on the basis of their personal economic interests. Particularly in view of the Board's appointment of an impartial hearing officer and the availability of state court review of any evidence of bias, there is nothing to suggest that the disciplinary hearings will be influenced by Board members' inappropriate economic motivation.

*Id.* at 1330.

Like the situation in *Massengale*, Arkansas's APA provides for state court review of any allegations of bias. *See* section 25-15-213. Ford is entitled to review of any such allegation from

---

[1] A second dealer commissioner was present during part of the hearings but did not deliberate or vote in this case.

both the circuit court and an appellate court. Moreover, there was an impartial hearing officer appointed to oversee the Commission proceedings. Here, Ford failed to demonstrate that any particular commissioner was actually biased against it. Accordingly, we reject Ford's argument that it was prejudiced by the failure of certain commissioners to recuse from this case.

## IV. Violation of Commission Rule 2.18

Finally, Ford argues that the Commission violated its own Rule 2.18 by failing to require that commissioners who were not present during the hearing of this matter review the transcript of the proceedings before voting in this case. This argument, however, is not preserved for our review.

The record reflects that during the May 14 hearing, counsel for Ford inquired as to whether the commissioners who did not attend the evidentiary portion of the hearing had reviewed the transcript. The chairman of the Commission then replied that the non-attending commissioners had not been given the transcript but had reviewed the proposed findings. Counsel for Ford was thus put on notice that the full Commission had not reviewed the transcript, but then failed to raise any objection to proceeding with the hearing. Thus, Ford's failure to object at the first opportunity precludes this court from reviewing the merits of this argument. It is well settled that this court will not consider arguments raised for the first time on appeal. *South Central Ark. Elec. Coop. v. Buck*, 354 Ark. 11, 117 S.W.3d 591 (2003); *Arkansas Blue Cross & Blue Shield v. Hicks*, 349 Ark. 269, 78 S.W.3d 58 (2002).

We reverse and remand this matter to the Commission for proceedings consistent with this opinion.