Linda BATISTE, Abrham Batiste  *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

04–486                                                              204 S.W.3d 521

Supreme Court of Arkansas
Opinion delivered March 3, 2005

*Terrence Cain,* for appellants.

*Gray Allen Turner,* for appellee.

DONALD L. CORBIN, Justice. This is an appeal from a decision by Appellee Arkansas Department of Human Services ("DHS") denying Appellants' Linda and Abrham Batistes'[1] petition for an adoption subsidy. On appeal, Mrs. Batiste argues that the decision of the Administrative Law Judge ("ALJ") was in error because: (1) DHS's failure to inform of the availability of the federal adoption subsidy constitutes an extenuating circumstance warranting reconsideration of the subsidy application; (2) DHS's method of administering the subsidy program violates the Supremacy Clause of the United States Constitution; (3) Mrs. Batiste was entitled to a state adoption subsidy because DHS exercised dominion and control over her children prior to their adoption; and (4) Mrs. Batiste is entitled to a state subsidy because her children developed severe medical conditions after the adoption that were unknown prior to the entry of the adoption decree. This case was transferred to us from the Arkansas Court of Appeals, as involving an issue of first impression; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). Because the ALJ erred in determining that the children were not in the custody of DHS at the time of the adoption, we reverse and remand.

The record reveals that S.B., L.B., and K.B. were removed from their parents' home on January 27, 1993, following the death of their sibling, T.D. Initially, the children were placed into foster care. On February 5, 1993, the juvenile court entered an emergency order finding that the children were dependent-neglected. The children were subsequently placed in the Batistes' home on February 18, 1993, after the juvenile court granted them temporary custody. Mrs. Batiste is the children's mother's aunt. Initially, the goal in the dependency-neglect case was to reunite the children with their parents. After it became evident that reunification was not going to be possible, the goal was changed to termination of parental rights. The Batistes then decided to petition the court to adopt the children. An order granting their petition for adoption was entered on February 27, 1995.

After adopting the children, the Batistes began facing economic hardships. Mr. Batiste became disabled and had to quit his job with the federal government. In addition, the children began experiencing significant health problems that led to costly medical bills. Specifically, S.B. began to go blind and suffered from post-traumatic stress disorder ("PTSD"); L.B. also suffered from

---

[1] Mr. Batiste is now deceased and thus not a party to the present appeal.

PTSD; and K.B. developed severe asthma. Mrs. Batiste contacted DHS in February of 1995 to determine if there were any funds available to help with the medical costs of her adopted children. According to Mrs. Batiste, it was then that she learned of the availability of federal and state adoption subsidies.

On February 9, 1999, the Batistes filed an application for an adoption subsidy with DHS. In a letter dated March 11, 1999, DHS denied their petition. The Batistes then requested an internal review of their petition. In a letter dated April 9, 1999, DHS stated that an internal review had been conducted, and the petition was being denied because the children were not in the custody of the State at the time of the adoption. The Batistes then requested a hearing, which was held on August 6, 1999.

Following the hearing, the ALJ issued a written opinion affirming DHS's denial of the subsidy. Specifically, the ALJ determined that the Batistes were not entitled to the adoption subsidy because the children were not in the custody of DHS at the time of the adoption. According to the ALJ, custody was transferred from DHS to the Batistes by the court order dated February 18, 1993.

The Batistes timely petitioned the Pulaski County Circuit Court for review of the agency decision. In an order dated March 19, 2001, the circuit court remanded the matter to the ALJ with directions that the ALJ make a specific finding on the issue of whether the state's subsidy program was in conflict with the federal government's subsidy program. In a letter order dated January 29, 2002, the ALJ ruled that there was no conflict between the state and federal programs. The ALJ further noted that the Batistes were not eligible for a federal subsidy because their children were never determined to be Title IV-E eligible.

The Batistes again petitioned the circuit court for review of DHS's decision. The trial court ordered the parties to submit trial briefs on the issue of whether there was a conflict between the state and federal subsidy programs. Thereafter, the trial court entered an order on January 9, 2004, finding that DHS's denial of the Batistes' petition was supported by substantial evidence. This appeal followed.

Before turning to the merits of Mrs. Batiste's arguments, we note that judicial review of a decision by DHS is governed by the Administrative Procedure Act (APA), Ark. Code Ann. § 25-15-212 (Repl. 2002). The appellate court's review is directed, not toward the circuit court, but toward the decision of the agency,

because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *Ford Motor Co. v. Arkansas Motor Veh. Comm'n*, 357 Ark. 125, 161 S.W.3d 788 (2004); *Arkansas State Police Comm'n v. Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999). Our review of administrative decisions is limited in scope. *Williams v. Arkansas State Bd. of Phys. Therapy*, 353 Ark. 778, 120 S.W.3d 581 (2003). When reviewing such decisions, we uphold them if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *Pine Bluff for Safe Disp. v. Arkansas Poll. Control & Ecol. Comm'n*, 354 Ark. 563, 127 S.W.3d 509 (2003); *Hamilton v. Arkansas Poll. Control & Ecol. Comm'n*, 333 Ark. 370, 969 S.W.2d 653 (1998).

In determining whether a decision is supported by substantial evidence, we review the record to ascertain if the decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Ford Motor Co.*, 357 Ark. 125, 161 S.W.3d 788; *Pine Bluff for Safe Disp.*, 354 Ark. 563, 127 S.W.3d 509. In doing so, we give the evidence its strongest probative force in favor of the administrative agency. *Id.* The question is not whether the testimony would have supported a contrary finding, but whether it supports the finding that was made. *Arkansas Bd. of Exam'rs v. Carlson*, 334 Ark. 614, 976 S.W.2d 934 (1998). As true for any other factfinder, it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord the evidence. *Id.*

The requirement that the agency's decision not be arbitrary or capricious is less demanding than the requirement that it be supported by substantial evidence. *Pine Bluff for Safe Disp.*, 354 Ark. 563, 127 S.W.3d 509. To be invalid as arbitrary or capricious, an agency's decision must lack a rational basis or rely on a finding of fact based on an erroneous view of the law. *Id.* Where the agency's decision is supported by substantial evidence, it automatically follows that it cannot be classified as unreasonable or arbitrary. *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992).

With this standard in mind, we now turn to Mrs. Batiste's arguments on appeal. This issue is actually raised as Mrs. Batiste's third point on appeal; however, because this point constitutes reversible error, we will address it first. Mrs. Batiste argues that the ALJ erred in determining that she was not entitled to an adoption

subsidy under the State program because the children were not in DHS's custody at the time of the adoption. DHS argues that Mrs. Batiste is not eligible for an adoption subsidy because the children were in her custody at the time of the adoption, not the State's. We agree with Mrs. Batiste.

The Federal Adoption Assistance and Child Welfare Act of 1980, codified at 42 U.S.C. §§ 670-76, amended Title IV-E of the Social Security Act and provides for adoption assistance for children with special needs. Pursuant to this Act, each state is required to enact its own program to administer adoption assistance. The Arkansas Subsidized Adoption Act, promulgated by Act 1109 of 1979, is codified at Ark. Code Ann. §§ 9-9-401 to -412 (Repl. 2002). The purpose of this act is set out in section 9-9-403, which provides:

> The purpose of this subchapter is to supplement the Arkansas adoption statutes by making possible through public financial subsidy the most appropriate adoption of each child certified by the Department of Human Services as requiring a subsidy to assure adoption.

Pursuant to section 9-9-404, DHS is the agency responsible for establishing and administering an ongoing program of adoption subsidies. Thus, DHS promulgates the regulations governing administration of the subsidy program. DHS is also responsible for determining who is eligible for the adoption subsidies.

In the instant case, DHS determined that the Batistes were not eligible for an adoption subsidy on the ground that their adopted children were not in the custody of DHS at the time of the adoption as required under the State's subsidy program. Specifically, DHS relied on section 9-9-402, which provides in relevant part that "child" means a minor that is "[i]n the custody of the Department of Human Services[.]" Nothing in that section further defines what encompasses such custody. Thus, we must determine whether there is a distinction between legal custody and physical custody.

In order to answer this question, it is helpful to review the statutory provisions governing cases, such as the present one, where a child is removed from the parents' home after an adjudication of dependency-neglect. Pursuant to Ark. Code Ann. § 9-27-334(a)(2)(A) (Supp. 1993), once a juvenile is found to be dependent-neglected, the court may "transfer custody of the

juvenile to the Department of Human Services, to another li-
censed agency responsible for the care of juveniles, or to a relative
or other individual." Initially, these children were placed into the
foster-care system. A little less than one month later, physical
custody of the children was transferred to the Batistes. DHS,
however, had an open case file on the children during this time,
with the goal set as reunification with the children's biological
parents.

It was only after the eighteen-month-dispositional hearing,
that DHS changed the goal from reunification to termination of
parental rights. A case wherein DHS seeks to terminate parental
rights is governed by Ark. Code Ann. § 9-27-341 (Supp. 1995),
which provides in relevant part:

> (a) This section shall be a remedy available only to the Depart-
> ment of Human Services. It shall not be available for private
> litigants or other agencies. It shall be used only in such cases when
> the Department of Human Services is attempting to clear a juvenile
> for permanent placement. . . .

> (b) The court may consider a petition to terminate parental
> rights *if it finds that the Department of Human Services has physical or
> legal custody of the juvenile,* an appropriate placement plan for the
> juvenile and the parent or parents, or putative parent, if the putative
> parent can be identified, have received actual or constructive notice
> of the hearing to terminate parental rights. [Emphasis added.]

It is true that in this case, termination was ultimately granted
in the context of the Batistes' adoption decree, as provided for in
Ark. Code Ann. § 9-9-220 (Repl. 1993), but it is noteworthy that
DHS, who initially pursued the termination, could only have done
so because they had legal custody of the children.

Moreover, in the present case, the evidence demonstrates
that while the Batistes had physical custody of the children, DHS
maintained legal custody of them. Mrs. Batiste testified at the
administrative hearing that the children were placed with them
based upon a recommendation from someone at SCAN or DHS
after a home study was conducted. According to Mrs. Batiste,
when the children initially came into her custody, the goal in the
case plan was to reunite them with their parents, until DHS
recommended that the goal be changed to termination of parental
rights. Once the plan was changed to termination, the Batistes filed
their petition to adopt the children. According to Mrs. Batiste,

they had to comply with a case plan the entire time the children were in their custody until the adoption was approved by the juvenile court. This case plan included making the children available for counseling, as well as for visits with their parents. Mrs. Batiste stated that they were told that if they did not comply with the case plan that the children would be taken from their home. Mrs. Batiste also stated that she did not believe that she had legal custody of the children during the time leading up to the adoption. In fact, according to Mrs. Batiste, a SCAN employee told her that she did not have custody of the children and that they were only allowed to live in her home. On cross-examination, Mrs. Batiste testified that she believed the children were in the State's custody and that she had to abide by the State's rules. Also, Mrs. Batiste stated that at the time the children were in her custody prior to the adoption, the children qualified for financial aid in the form of AFDC and Medicaid, but once they were adopted the aid was terminated because of the Batistes' income.

Ed Wallace, an employee of DHS, testified that the Batistes were not eligible for an adoption subsidy because the children were not in the custody of DHS at the time of the adoption. He also testified that pursuant to a court order, the children's biological parents were ordered to make support payments to the Batistes in the amount of $25 per week. Mr. Wallace conceded that during the time the Batistes had physical custody of the children, there was a protective-services file open and that the juvenile court conducted review hearings and that DHS ultimately changed the goal in the case from reunification to termination of parental rights. Wallace also admitted that there were case plans in effect that the Batistes had to comply with in order to maintain physical custody of the children.

Also included in the record is a review order in the dependency-neglect case dated March 23, 1994.[2] In that order, the juvenile court ordered SCAN and/or DHS to continue to offer treatment services with the goal in the case plan to be family reunification. The court went on to state that the next review hearing would be the eighteen-month-dispositional hearing. The order goes on to specifically provide:

---

[2] While the above-stated order is not included in the addendum, it is in the record. In reviewing agency decisions, however, this court's standard is to review the record to ascertain if there is substantial evidence supporting the decision of the ALJ. *See Pine Bluff for Safe Disp.*, 354 Ark. 563, 127 S.W.3d 509.

9. During the time the State of Arkansas is obligated to make foster care maintenance payments on behalf of any dependent-neglected child named herein, any parent, guardian, or custodian who is receiving or is entitled to receive child support or maintenance payments for said child is hereby ordered to pay such amounts as are received to the Arkansas Department of Human Services. Should such payment be subject to any order of payment to the clerk of a court, a filed copy of this order shall be provided to such clerk, who shall upon receipt thereof, transfer such payments to a designated agent of the Department of Human Services. Upon receipt of such funds as are hereby assigned, the Department of Human Services shall prepare a written record of such payment. Any such funds received by the State may be applied to recoup money already expended by the State of Arkansas for said child. The Department of Human Services is authorized to undertake enforcement action as to support including arrearages. Any amount recovered in excess of support requirements which are not subject to recoupment shall be distributed in accordance with Title IV-D of the Social Security Act.

10. This court directs that said juveniles be provided with physical, mental or emotional care as required in the opinion of a duly authorized or licensed physician, dentist, surgeon, or psychologist, whether or not such care is rendered on an emergency basis or on an inpatient or outpatient basis, and the Court consents to such care. And further, the Court authorizes the custodian or designates agents to consent to specific treatment and procedure.

Thus, this order is further evidence that DHS was an active participant in this case until the Batistes' adoption petition was approved.

Finally, the adoption decree also provides evidence regarding the true custody of these children. The adoption decree states that the matter arose out of a dependency-neglect action filed in the juvenile court. The decree also reflects that a home evaluation was conducted on the Batistes' home and that review hearings were conducted in the case. The decree reflects that an eighteen-month-dispositional hearing was held on September 12, 1994, and that reunification efforts were discontinued. A hearing on termination of parental rights was postponed at the parties' request until the date scheduled for an adoption hearing. Most importantly, the decree stated that the Batistes had *physical* custody of the three children since the latter part of February 1993.

■ In sum, the evidence before the ALJ was that while the children were in the Batistes' physical custody, DHS maintained a supervisory role over the children through the context of the protective-services case that remained open on the children until their parents' rights were terminated. Moreover, pursuant to our statutory scheme, DHS could not even seek termination of parental rights unless the children were in its custody. DHS's attempt to distinguish physical and legal custody exalts form over substance and leads to an absurd result in the present case. Accordingly, the ALJ's determination that the Batistes were not eligible for an adoption subsidy on the basis that the children were not in the custody of DHS at the time of the adoption is not supported by substantial evidence. We therefore reverse on this point.

Next, the Batistes argue that DHS failed to inform them of the availability of any adoption subsidy prior to their adopting the children, and such failure constitutes an extenuating circumstance warranting review of their application. DHS argues that this argument was not raised to the ALJ and thus is waived on appeal. Alternatively, DHS argues that at that the time the Batistes sought to adopt these children, it had no duty to inform those seeking to adopt of the availability of an adoption subsidy.

First, there is no merit to DHS's contention that this point was not raised before the ALJ. Based on a review of the testimony at the hearing before the ALJ, it is apparent that Mrs. Batiste raised the issue of whether or not DHS ever informed her or her husband that they might be eligible for an adoption subsidy. In fact, they both testified that no one ever informed them of the availability of such a subsidy. Ed Wallace, a DHS employee testified that DHS's current policy is to inform potential adoptive parents of the subsidies regardless of their income. June Fly, an adoption specialist with the Pulaski County Adoptions Unit testified that her Department was "struggling with [the] subsidy policy" during the years 1993 through 1995.

■ Moreover, in her opinion, the ALJ noted that the Batistes alleged that they had no knowledge of the subsidy program prior to the adoption. However, the ALJ's order makes no finding regarding this allegation, as it was unnecessary to address this issue once it was determined that these children were not in the custody of DHS at the time of the adoption. Accordingly, we believe the notification issue was sufficiently raised in the hearing before the ALJ.

Having determined that the issue was raised below, we now turn to the merits of Mrs. Batiste's argument that DHS had a duty to inform her of the subsidy program. We note at the outset that DHS argues that at the time the Batistes petitioned to adopt these children, it had no duty to inform them of the availability of adoption subsidies. DHS provides no support for this argument and, in fact, its assertion on this point is contrary to the law in effect at the time of the adoption. Notably, 45 C.F.R. § 1356.40 sets forth the regulations governing the administration of the adoption assistance program and requires states to meet the requirements of this section in order to be eligible for federal financial participation in adoption assistance payments. This section requires that an adoption assistance agreement be signed and in effect at the time of or prior to the final decree of adoption. *See* 45 C.F.R. § 1356.40(b)(1); *see also* section 9-9-408(a) (requiring a written agreement between the family entering into the subsidized adoption and DHS prior to entry of the final decree of adoption).

█ Additionally, subsection 45 C.F.R. 1356.40(f) requires that state agencies "must actively seek ways to promote the adoption assistance program." This requirement has been interpreted to mean that a state agency has a duty to inform adoptive parents of the availability of adoption subsidies. The United States Department of Health and Human Services (DHHS) reiterated this position in a policy announcement issued on January 23, 2001, wherein it stated in relevant part:

> The State title IV-B/IV-E agency is required to actively seek ways to promote the adoption assistance program. This means that it is incumbent upon the State agency to notify prospective adoptive parents about the availability of adoption assistance for the adoption of a child with special needs.

DHHS ACYF-CB-PA-01-01 (footnote omitted).

DHHS has also addressed the issue of what is to be done when adoptive parents are not notified of the availability of adoption subsidies prior to an adoption being finalized and later seek such subsidies. DHHS PIQ 92-02 was issued on June 25, 1992, and addressed the types of situations that would constitute extenuating circumstances and thus warrant review in a fair hearing under the federal provision. According to that policy interpretation, state notification to potential adoptive parents is a critical part of the program and such notification is the responsi-

bility of the state agency responsible for administering the Title IV-E program. Thus, according to DHHS's policy interpretation, failure to provide such notification constitutes an extenuating circumstance warranting a fair hearing.

██ Accordingly, in light of the regulation that a state agency must actively promote the adoption assistance program and the policy interpretation by DHHS that failure to do so constitutes an extenuating circumstance, it will be necessary on remand for the ALJ to make a factual determination as to whether or not DHS notified the Batistes of the availability of adoption subsidies. The mere fact that there was not a subsidy agreement signed prior to the entry of the adoption decree in this case does not preclude DHS from now determining whether Mrs. Batiste qualifies for an adoption subsidy if DHS failed to provide the requisite notice, as such a failure constitutes an extenuating circumstance.

Next, Mrs. Batiste argues that DHS requires prospective adoptive parents to be eligible for the state program as a condition of eligibility for the federal program, and because the state requirements are more exacting than those under the federal program, DHS's method of administering the program violates the Supremacy Clause of the United States Constitution. Specifically, Mrs. Batiste argues that:

> Although the requirements of the two subsidy programs are similar, the state requirements are more restrictive and when DHS and the ALJ applied the more restrictive state requirements to the Batistes' federal adoption subsidy request, both DHS and the ALJ ran afoul of the Supremacy Clause of the United States Constitution. [Footnote omitted.]

DHS again argues that this issue is not preserved for our review.

██ With regard to the preservation issue, it is unclear whether this argument was properly raised to the ALJ during the first administrative hearing. However, the record does reflect that during the hearing before the circuit court, Mrs. Batiste argued that there was a conflict between the state and federal laws governing adoption subsidies. At that time, the circuit court asked Mrs. Batiste's counsel if she had raised this argument to the ALJ. Counsel stated that she had raised the argument, and counsel for DHS made no argument to the contrary. The circuit court then remanded the matter to the ALJ with instructions for her to rule on

the conflicts issue. The ALJ then issued an order ruling on the issue. She made no mention that the argument had not been presented to her during the first administrative hearing. Thus, DHS is now arguing for the first time on appeal that this issue was not properly preserved, and this argument is without merit.

Nevertheless, Mrs. Batiste's argument on this point fails for two reasons. First, there is nothing in either the ALJ's initial order or the order on remand that indicates that she found that Mrs. Batiste was not eligible for the federal subsidy because she failed to satisfy requirements under the state provision. In her first order, the ALJ reaches no conclusion regarding Mrs. Batiste's eligibility under the federal program. Upon review, the trial court remanded the matter back to the ALJ for a finding of whether there was a conflict between the federal and state programs. The ALJ ruled that there was no conflict and additionally ruled that the Batistes were not eligible for the federal subsidy because the children were not eligible for Title IV-E assistance. The requirement concerning Title IV-E eligibility is found in 42 U.S.C. § 673, which governs the federal program. Thus, it appears that the ALJ based her ruling on federal eligibility on the federal requirements. Notably, in her opinion on remand, the ALJ specifically stated that "[t]he determination that was originally made in this case was based on *state* subsidy." Accordingly, Appellant's argument on this point is without merit as the ALJ did not base her decision on federal eligibility on state requirements.

Second, Mrs. Batiste failed to present any evidence to the ALJ to prove that there was a conflict between the two programs. Specifically, there was no testimony presented at the hearing before the ALJ regarding the funding of the state or federal subsidies. There was no specific evidence presented regarding the criteria used by DHS to determine eligibility for either program. Mrs. Batiste points to the testimony of Ed Wallace as proof that the state requirements are more exacting than the federal ones, but Mr. Wallace simply testified regarding his belief as to why the Batistes did not qualify for any subsidy. In the end, the ALJ determined that the Arkansas Subsidized Adoption Act was not in conflict with the Federal Adoption Assistance Program. Because there was no evidence to the contrary, we cannot say that the ALJ's decision was arbitrary and capricious. Accordingly, the ALJ's determination that there was no conflict is affirmed.

For her final point on appeal, Mrs. Batiste argues that she is entitled to a state subsidy because all three of her adopted children developed severe medical and psychiatric conditions that were unknown prior to entry of the adoption decree. Mrs. Batiste further argues that the General Assembly enacted section 9-9-408(c)(1) in anticipation that adoptive parents of special-needs children may need financial assistance in cases where the adopted children require medical treatment or hospitalization. DHS counters that there was insufficient evidence before the ALJ to support Mrs. Batiste's argument on this point. DHS correctly points out that the only evidence regarding the physical and mental condition of these children was the testimony from Mrs. Batiste that one child is going blind, one child suffers from asthma, and the third child suffers from PTSD.

We are unable to address the merits of this argument because while Appellant raised the general issue, it appears that the argument was never fully developed before the ALJ. More importantly, Mrs. Batiste failed to obtain a ruling on this specific issue. It is well settled that a party's failure to obtain a ruling precludes our review of an issue on appeal. *Bell v. Bershears*, 351 Ark. 260, 92 S.W.3d 32 (2002).

Reversed and remanded.

BROWN and IMBER, JJ., concur in part; dissent in part.

ROBERT L. BROWN, Justice, concurring and dissenting. I agree with the majority that the administrative law judge (ALJ) erred in determining that the Batiste children were not in the custody of appellee Arkansas Department of Human Services (DHS) at the time of the adoption. However, I dissent from that part of the majority's opinion where it reaches the merits of the Batistes' claim that DHS had a duty to inform them of the availability of an adoption subsidy and failed to do so. The reason I dissent is that the issue of duty-to-inform was raised to the ALJ by the Batistes, but she never ruled on it. I would remand this case to allow the ALJ to make a determination, both with respect to the law and the facts.

As the majority notes in this case, the ALJ first determined that the Batistes were not entitled to the state adoption subsidy, because the children were not in the custody of DHS at the time of the adoption. This was error; yet this is the reason the ALJ never

ruled on whether the Batistes were informed of an available adoption subsidy. Nevertheless, the majority goes forward and decides the legal issue of whether DHS had a legal duty to advise the Batistes of the subsidy pre-adoption under federal regulations, state law, and a U.S. Department of Health and Human Services policy announcement. The majority concludes that failure to notify of the subsidy is an extenuating circumstance that warrants a fair hearing under the policy announcement. After deciding the legal question, the majority remands so that the ALJ can decide the factual issue of whether the Batistes were notified by DHS of the subsidy.

There is no dispute that the ALJ never ruled on the legal issues now decided by the majority opinion. By deciding these issues, the majority usurps the role of the ALJ after noting in its opinion that this court has historically deferred to administrative agencies. The majority states that these agencies are better equipped by specialization, possess insight through experience, and use more flexible procedures than courts to determine and analyze *legal issues* affecting their agencies. The majority then cites authority to that effect. *See Ford Motor Co. v. Arkansas Motor Veh. Comm'n*, 357 Ark. 125, 161 S.W.3d 788 (2004); *Arkansas State Police Comm'n v. Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999). The majority also refers to Ark. Code Ann. § 25-15-212(h) (Repl. 2002), which sets out the criteria for judicial review. The criteria include an agency decision in violation of statutory authority or otherwise in violation of the law. *See* Ark. Code Ann. § 25-15-212(h)(1)-(4) (Repl. 2002). This presupposes that the administrative agencies decided the legal issues first. That, of course, has not been done in the instant case. In addition, Ark. Code Ann. § 25-15-210(b)(2) (Repl. 2002), requires that an agency's final decision include findings of fact and *conclusions of law*. *See* Ark. Code Ann. § 25-15-210(b)(2) (Repl. 2002).

Moreover, I would do a general remand to the ALJ so that she may also rule on the issue of adoption subsidies in connection with the post traumatic stress syndrome of one child, the blindness of another child, and the asthmatic condition of a third. There is no question but that the Batistes raised these eligibility issues after the adoption took place, and there was no ruling by the ALJ.

For these reasons, I concur in part and dissent in part.

IMBER, J., joins.