2011 Ark. App. 389

Leonard HESTER, Appellant

v.

ARKANSAS PROFESSIONAL BAIL
BONDSMAN LICENSING
BOARD, Appellee.

No. CA 10–1127.

Court of Appeals of Arkansas.

May 25, 2011.

William R. Mayo, Fayetteville, for appellant.

Dustin McDaniel, Atty. Gen., Amanda Abernethy, Little Rock, for appellee.

DOUG MARTIN, Judge.

Appellant Leonard Hester appeals from the Pulaski County Circuit Court's decision affirming the revocation of his bail bond agent license by the Arkansas Professional Bail Bondsman Licensing Board (the Board) upon the Board's finding that Hester violated Ark.Code Ann. § 17–19–101 et seq., as well as the Rules and Regulations of the Arkansas Professional Bail Bond Company and Professional Bail Bondsman Licensing Board. Hester argues that there was no evidence that he had knowledge of or authorized the actions taken by a nonlicensed individual employed by Midwest. Hester further argues that the Board's decision to revoke his license, while imposing only a fine on his employer, was the result of disparate treatment and is therefore arbitrary and capricious. We disagree and affirm.

"No person other than an Arkansas-licensed bail bond agent, an Arkansas-licensed private investigator, a certified law enforcement officer, or a person acting under the direct supervision" of a licensed agent shall be authorized to apprehend, detain, or arrest a defendant. Ark. Code Ann. § 16–84–114(b)(2) (Repl.2005). Bail bond agents are directed to notify the local law enforcement agency or agencies of their presence when attempting to apprehend a defendant and to advise the agency of the defendant's name, charges, and suspected location. Ark.Code Ann. § 16–84–114(4). Section 4, subsection O, of the Arkansas Professional Bail Bondsman Licensing Board Rules and Regulations defines "direct supervision" as when "the person is in the physical presence of, and acting pursuant to instructions from, an Arkansas licensed bail bondsman."

Robert Olson, Jr., owns Midwest Bonding, Inc., which employed Hester as a bail bond agent. Olson operated Midwest's office in Springdale, while Hester worked out of Midwest's office in Bentonville. Midwest also employed Vernon J. Meyer (V.J.) to do office work. According to Hester, his "tracker," Jim Fowler, who was a licensed bail bondsman for Exit Bail Bonding, "wasn't having ... any luck" in apprehending defendant Matthew King. Consequently, in November 2008, Hester offered V.J., a nonlicensed individual, $300 to "catch" King.

In December 2008, V.J. attempted to apprehend King when he went to an address in Gentry unaccompanied by a licensed bail bondsman and without notifying local law enforcement. V.J. knocked on the door at a trailer house, and King answered the door. King's three children were present. King ran to a sliding glass door at the back of the house, and V.J. followed him. A foot chase ensued through the backyard and over a barbed-wire fence. V.J. tackled King but then realized he had lost his handcuffs during the pursuit. Around the same time, King's father-in-law and wife appeared, and V.J.

was threatened by those individuals with a baseball bat. V.J. held up a can of mace to defend himself. When King took the bat and raised it toward him, V.J. relented momentarily for his own safety. King fled in a vehicle. V.J. attempted to continue his pursuit of King in his own vehicle, but King's wife stood in his way. In a statement given to the Board, V.J. indicated that he "just kept going in reverse til she moved and was out of my way." Meanwhile, the owner of the residence where King was staying had called the police. The police soon arrived and detained V.J. to ascertain his reason for pursuing King, which resulted in King's escape. V.J. called Hester and explained what had happened. According to Hester, he told V.J. to "never go without anybody with you."

At the end of June 2009, Hester received information from a confidential informant in Siloam Springs that King and his wife, Julie, were kicked out of a trailer park in Oklahoma and were staying with one of Julie's sisters in Centerton. The informant also related that Julie worked at a Taco Bell in Bentonville.

On July 5, 2009, V.J. located King by following King's wife to a motel after she completed her shift at Taco Bell. Once again, V.J. was not accompanied by a licensed bail bondsman and did not contact local authorities. The man at the front desk of the motel identified King from a picture V.J. handed him, and the man called King's room. Julie spoke with V.J. outside the motel room until King finally emerged and surrendered. V.J. then called Hester, and they met at the Benton County Detention Center, where they filled out paperwork and surrendered custody of King. Hester paid V.J. the $300 fee previously agreed upon.

Board Investigator L.E. Peters learned of V.J.'s involvement with King's apprehension, which prompted an investigation.

Peters, who is a personal friend of Olson, contacted Olson to inform him of the findings of that investigation in mid-July 2009. As a result, Olson terminated V.J.'s employment with Midwest. On September 8, 2009, Peters filed a complaint with the Board against Olson and Hester. In October 2009, Olson terminated Hester's employment with Midwest.

At the administrative hearing before the Board, Peters testified that he became aware of the situation involving Hester when he received telephone calls relating rumors that a self-proclaimed "bounty hunter" was at the Benton County jail "talking about taking a baseball bat to a person they apprehended." Over the course of his investigation, Peters learned that V.J., a nonlicensed individual, had in fact represented that he was a "bounty hunter." Peters also learned that V.J. is a felon.

In a statement to the Board, Olson indicated that V.J. had contacted him in November 2008 about bounty hunting and that Olson told him he was not qualified. Olson testified that, prior to hiring V.J., he called two other bonding companies where V.J. previously worked and was told V.J. is "a damn good tracker." Olson's statement indicated, "At that time, I informed [V.J.] he could perform phone work or tracking, but if he had information he is to contact the Bail Agent to make the arrest." Olson stated that it was not until mid-July 2009 that he learned Hester had not accompanied V.J. during either of his contacts with King and that V.J. is a felon.

Hester testified that he hired V.J. to go with his tracker, Jim Fowler, to "catch" King. Hester testified that V.J. did not tell him he was going to apprehend King in Gentry in December 2008 until after the fact. Hester testified that, following the incident, he specifically warned V.J. not to go after King unaccompanied by a bail

bondsman but that V.J. did it again in July 2009.

The Board found that Midwest, Olson, and Hester used the services of a nonlicensed individual to locate and apprehend defendants from December 2008 to July 2009. The Board found that V.J. attempted apprehension of a defendant without direct supervision and without providing the required notice to local law enforcement prior to his apprehension of defendant King. The Board concluded that Midwest and Olson were responsible for the conduct of Hester and V.J. The Board further concluded that Olson and Hester violated provisions of the law and rules and regulations and acted "in a manner that demonstrates incompetency or untrustworthiness." The Board determined that Hester's license should be revoked, and the Board imposed a fine of $5,000 on Midwest and Olson.

Arkansas Code Annotated section 17–19–210(b) (Repl.1995) provides that the "acts or conduct of any professional bail bondsman who acts within the scope of the authority delegated to him or her shall also be deemed the act or conduct of the professional bail bond company for which the professional bail bondsman is acting as agent." The Professional Bail Bond Company and Professional Bail Bondsman Licensing Board may suspend for up to twelve months or revoke or refuse to continue any license issued pursuant to the provisions of this chapter if the Board determines that a licensee demonstrated incompetence or untrustworthiness to act as such a licensee. Ark.Code Ann. § 17–19–210(a)(3). Arkansas Code Annotated section 17–19–211 (Repl.1997) provides for an alternative sanction of an administrative penalty not to exceed $5,000 against a licensee where grounds exist for suspension or revocation of the license. Accordingly, the Board was authorized to mete out the punishments that the Board determined were warranted for Midwest, Olson, and Hester.

In an appeal of an administrative decision under the Administrative Procedure Act, Ark.Code Ann. § 25–15–201 et seq., our review is directed, not toward the circuit court, but toward the decision of the agency, because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *See Ford Motor Co. v. Ark. Motor Vehicle Comm'n,* 357 Ark. 125, 161 S.W.3d 788 (2004). Our review of administrative decisions is limited in scope. *Id.* "It is not the role of the circuit courts or the appellate courts to conduct a *de novo* review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision." *Tomerlin v. Nickolich,* 342 Ark. 325, 331, 27 S.W.3d 746, 749 (2000). When reviewing such decisions, we uphold them if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *Id.* We review the entire record to determine whether there is any substantial evidence to support the agency's decision and whether it is arbitrary or capricious. *Wacaser v. Insurance Comm'r,* 321 Ark. 143, 900 S.W.2d 191 (1995). "[B]etween two fairly conflicting views, even if the reviewing court might have made a different choice, the board's choice must not be displaced." *Ark. Contractors Lic. Bd. v. Pegasus Renovation Co.,* 347 Ark. 320, 326, 64 S.W.3d 241, 245 (2001).

Arkansas Code Annotated section 25–15–212(h) (Repl.2002) provides that this court may reverse or modify the Board's decision if the substantial rights of the petitioner have been prejudiced because

the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the agency's statutory authority;

(3) Made upon unlawful procedure;

(4) Affected by other error or law;

(5) Not supported by substantial evidence of record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion.

Substantial evidence has been defined as valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support a conclusion and force the mind to pass beyond conjecture. *Olsten Health Servs., Inc. v. Ark. Health Servs. Comm'n*, 69 Ark.App. 313, 12 S.W.3d 656 (2000). To establish a lack of substantial evidence, an appellant is required to demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach the same conclusion. *Id.* The question is not whether the evidence would have supported a contrary finding but whether it supported the finding that was actually made. *Id.* The evidence is given its strongest probative force in favor of the administrative agency's ruling. *Id.* The credibility and the weight of the evidence is within the administrative agency's discretion. *Ark. Bd. of Registration for Prof'l Geologists v. Ackley*, 64 Ark.App. 325, 984 S.W.2d 67 (1998). It is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord the evidence. *McQuay v. Ark. State Bd. of Architects*, 337 Ark. 339, 989 S.W.2d 499 (1999).

Administrative action may be regarded as arbitrary and capricious where it is not supportable on any rational basis. *Olsten, supra.* To have an administrative action set aside on this basis, the party challenging the action must prove that there was a willful and unreasoning action, without consideration, and with disregard of the facts and circumstances of the case. *Id.* If an agency's action is supported by substantial evidence, then it follows automatically that the agency's decision cannot be characterized as arbitrary or capricious. *Franklin v. Ark. Dep't of Human Servs.*, 319 Ark. 468, 892 S.W.2d 262 (1995).

Hester concedes that V.J.'s actions were in violation of state law and the Board's rules and regulations, but he argues that there was no evidence that he had knowledge of or authorized V.J.'s actions. We disagree. Hester expressly testified that V.J. acted pursuant to his direction. Hester instructed V.J., a nonlicensed individual hired by Olson to perform office work, to "catch" or apprehend King. Hester was aware that V.J. improperly attempted to apprehend King in December 2008, but Hester continued to use V.J. until King was apprehended in July 2009. Also, Hester's testimony in the record indicates that he was aware that Fowler was no longer with Exit Bail Bonding in July 2009 "so [V.J.] couldn't have called [Fowler] to begin with" in order to accompany him to the motel to apprehend King. Finally, Hester acknowledged that he did not give V.J. the $300 in December 2008 because V.J. did not apprehend King. There was substantial evidence before the Board from which the Board could conclude that Hester had knowledge of and authorized V.J.'s actions.

Hester relies on two decisions by the Arkansas Supreme Court, recognizing that "the penalty imposed by an administrative agency may be so harsh that its imposition may be described as arbitrary and capricious," even when there is substantial evidence to support the board's finding that

an appellant violated laws and regulations related to his field. *See Collie v. Ark. State Med. Bd.,* 370 Ark. 180, 258 S.W.3d 367 (2007); *Baxter v. Ark. State Bd. of Dental Exam'rs,* 269 Ark. 67, 598 S.W.2d 412 (1980). Hester cites no cases by the Arkansas Professional Bail Bond Licensing Board; rather, he analyzes the punishments meted out by the boards in the two cases cited above. Those cases are distinguishable. Our supreme court in *Baxter* modified the punishment received by dentists who violated the Board of Dental Examiners' rules because the court found that the dentists had not "embarked on a calculating course of willfully violating the law" by engaging in a billing practice that was common in the industry. *Baxter,* 269 Ark. at 77, 598 S.W.2d at 418. Likewise, our supreme court in *Collie* held that revocation of a doctor's license was not commensurate with his offense. The doctor, who had been practicing medicine for thirty-four years without a blemish on his record, violated the Medical Board's rules by writing prescriptions for the same drugs his patient had been using for some time after he became romantically involved with her. The court reasoned that the doctor did not use the prescriptions to seduce his patient, and the doctor attempted to terminate his professional relationship with his patient before beginning a personal relationship. Unlike the circumstances in *Baxter* and *Collie,* Hester willfully utilized V.J. to apprehend defendants, which involves situations fraught with danger.

Next, Hester argues disparate treatment in that Midwest and Olson were merely fined, while his license was revoked. Hester argues that his culpability was no greater than that of his employer, noting that Midwest and Olson had equal, if not superior, responsibility for V.J. as his "ultimate employer." Hester's own testimony before the Board, however, demonstrates that his level of culpability

was indeed greater than that of his employer. Hester testified, "Bob [Olson] did not know that V.J. had gone to Gentry by himself. Bob didn't have any idea what was going on. Unless I had a problem, you know, I didn't tell him." Moreover, Hester testified at the administrative hearing, "I don't know what to do except take the responsibility because it was me who hired [V.J.]." The Board was entitled to believe that Olson did not learn of the events leading up to the Board's action until late July 2009. On the other hand, the evidence supports the Board's conclusion that Hester knew that V.J. was attempting to apprehend King and, in fact, commissioned V.J.'s services in this regard.

Hester contends that the only apparent basis for the disparity in treatment by the Board is that he was not represented by counsel. Arkansas Code Annotated section 17–19–209(c) (Repl.2001) provides that all hearings held under this chapter shall be conducted in the same manner as hearings held by the board under the Administrative Procedure Act, Ark.Code Ann. § 25–15–201 et seq., unless otherwise stated in this chapter. According to Ark.Code Ann. § 25–15–201(1), any person compelled to appear before any agency shall have the right to be accompanied and advised by counsel. In the notice of hearing sent to him by the Board, Hester was advised that he had the right to be represented by counsel. Hester was given the same opportunity to be represented by counsel as were Midwest and Olson; therefore, Hester cannot now complain of disparity in treatment in this regard.

Affirmed.

HART and GRUBER, JJ., agree.